762 N.E.2d 701 (2002)
326 Ill. App.3d 1110
261 Ill.Dec. 132
In re M.F. and T.R., Alleged to be Neglected Minors (The People of the State of Illinois, Petitioner-Appellee,
v.
Jeri Ferrell, Respondent-Appellant).
No. 4-01-01064.
Appellate Court of Illinois, Fourth District.
January 16, 2002.
*702 *703 David W. Butler (Court-appointed), Bloomington, for Jeri Ferrell.
Charles G. Reynard, State's Attorney, Bloomington, Norbert J. Goetten, Director, Robert J. Biderman, Deputy Director, Perry L. Miller, Staff Attorney, State's Attorneys Appellate Prosecutor, Springfield, for the People.
Justice KNECHT delivered the opinion of the court:
On April 27, 2000, the trial court found respondent mother, Jeri Ferrell, an unfit parent. 750 ILCS 50/1(D)(p) (West 2000). On February 9, 2001, the trial court terminated her parental rights to T.R. (born May 13, 1992) and M.F. (born March 28, 1998). Jeri appeals, arguing (1) the trial court erred in finding her to be an unfit parent; (2) the trial court erred in ruling no party has the burden of proof in the best-interest stage of termination of parental rights proceedings; (3) the trial court erred in finding it was in the best interest *704 of the minors her parental rights be terminated; and (4) she received ineffective assistance of counsel during the termination proceeding. We affirm in part, reverse in part, and remand with directions.

I. BACKGROUND
On January 2, 1999, Jeri, a diagnosed schizophrenic, attempted suicide by taking an overdose of medications. She was admitted to the hospital that day to be medically stabilized. She was transferred to the psychiatric unit and remained there from January 5 to January 11. The Department of Children and Family Services (DCFS) received a report on January 9 that M.F. was at risk of harm due to his mother's actions. M.F., then nine months old, was staying with Jeri's parents, Jim and Sue Ferrell. Both Jeri and M.F. resided with Jim and Sue for a period after M.F.'s birth while her medications became stabilized.
In July 1995, Jim had been indicated by DCFS for risk of sexual harm to a two-year-old girl being cared for by Sue and for sexual molestation of his then three-year-old granddaughter, T.R. Jim denied the allegations and did not undergo counseling. A protective order prevented him from any contact with T.R. M.F. was taken into protective custody from Jim and Sue by DCFS on January 11. T.R. was placed in foster care where he has resided throughout the pendency of these proceedings.
On January 12, 1999, the State filed a petition for adjudication of wardship in No. 99-JA-5, alleging Jeri and M.F.'s father, Ashley Evans, neglected M.F. by providing an environment injurious to M.F.'s welfare due to, among other things, Jeri's attempted suicide and resulting hospitalization. At the adjudicatory hearing on February 18, Jeri admitted this allegation of neglect and the other allegations were dismissed.
At the conclusion of the dispositional hearing on April 30, the trial court entered an order finding Jeri to be unfit and adjudicated M.F. a ward of the court, transferring guardianship to DCFS.
On March 31, the State filed a petition for adjudication of wardship in No. 99-J44, alleging T.R. was a neglected minor due to injurious environment while in the care of respondent as Jeri has mental health issues as admitted in No. 99-JA-5 and to permit her to have unsupervised contact with T.R. would create a risk of harm for the minor. The petition was amended on July 7 alleging T.R. was neglected due to an injurious environment while in the care of respondent as Jeri had been found unfit in No. 99-JA-5. An adjudicatory hearing was held on July 26, and the trial court found both allegations of neglect proved. On January 20, 2000, a dispositional order was entered adjudicating T.R. a ward of the court. Guardianship was not transferred to DCFS but, rather, full legal and physical custody was granted to T.R.'s father, David R., with whom she has resided continuously since her parents' divorce in 1993.
Jeri has had visitation with T.R. since the divorce. Initially the visitation was unsupervised, but after the allegations of sexual abuse on the part of her father, Jim Ferrell, in 1995, in 1996 the visits became supervised pursuant to court order and remained so to the present.
The State filed petitions to terminate Jeri's parental rights as to both M.F. and T.R. on January 20, 2000. Both petitions alleged Jeri is an unfit person under section 1(D)(p) of the Adoption Act (750 ILCS 50/1(D)(p) (West 2000)) and her parental rights should be terminated. A consolidated hearing on both petitions to terminate was conducted between April 2000 and *705 February 2001. The trial court terminated Jeri's parental rights to both T.R. and M.F. This appeal followed.

II. ANALYSIS

A. Unfitness
Jeri first contends the trial court's order finding her to be an unfit parent was against the manifest weight of the evidence. Both petitions to terminate parental rights alleged several grounds for finding Jeri to be unfit but the trial court ultimately found her to be unfit in both cases on the following basis:
"She has an inability to discharge parental responsibilities supported by competent evidence from a psychiatrist, licensed clinical social worker, or clinical psychologist of mental impairment, mental illness or mental retardation as defined in [s]ection 1-116 of the Mental Health and Developmental Disabilities Code, or developmental disability as defined in [s]ection 1-106 of that code and there is sufficient justification to believe that the inability to discharge her parental responsibilities shall extend beyond a reasonable time period."
Parental unfitness in the context of a petition to terminate parental rights must be proved by clear and convincing evidence. In re J.G., 298. Ill.App.3d 617, 627, 232 Ill.Dec. 720, 699 N.E.2d 167, 174 (1998). A finding of unfitness will not be set aside on appeal unless it is against the manifest weight of the evidence. In re A.P., 277 Ill.App.3d 592, 598, 214 Ill.Dec. 299, 660 N.E.2d 1006, 1010, (1996). A two-part analysis is necessary to determine whether a parent is unfit due to a form of mental disability. First, competent evidence from the designated category of experts must show the parent suffers from a mental disability which prevents him or her from discharging parental responsibilities. Second, sufficient justification must be established to believe the inability to discharge parental responsibilities will extend beyond a reasonable time period. In re J.A.S., 255 Ill.App.3d 822, 824, 194 Ill. Dec. 433, 627 N.E.2d 770, 771-72 (1994).
Jeri admits Dr. Marty Traver, a licensed clinical psychologist, testified she has a diagnosis of schizo-affective disorder and paranoid schizophrenia, which constitute a mental impairment or mental illness within the definition of the Mental Health and Developmental Disabilities Code (405 ILCS 5/1-100 through 6-103 (West 2000)). Jeri argues the State failed to prove by clear and convincing evidence this condition would prevent her from discharging her parental responsibilities. Jeri contends while the evidence indicated she was not a candidate for full-time parenting of her children at the time of the hearing, it also indicated her mental condition has stabilized and she interacts appropriately with her children.
The expert testimony of Dr. Traver, who conducted a psychological evaluation of Jeri, as well as the notes of Dr. Bhaskar Damera, her treating psychiatrist, which were introduced into evidence, indicate Jeri's condition is chronic, has existed for over 10 years, and will continue indefinitely. Her history includes a suicide attempt, unusual behavior, unpredictable mood swings, delusions and hallucinations, and difficulties in communication. In the past, Jeri had not taken her medication as prescribed and argued with her doctors on the necessity of certain medications. She was aware of her diagnoses and was now doing better on new medication and admitted to her need to take it for the rest of her life.
Jeri is not self-sufficient. Although she lives in her own apartment, she eats most her meals with her parents at their home. She has a protective payee for her Social *706 Security disability checks, which are her sole means of support.
If Jeri were to have a psychotic episode, she would pose a risk to a child in her care. Further, her ability to protect her children from harm is limited due to her failure or inability to acknowledge or identify potential harm. Both Dr. Traver and Dr. Damera indicated her prognosis for improvement is poor.
At visits with M.F., testimony indicated Jeri would reveal her frustrations by relying on her mother's assistance, elevating her voice level, making joking threats, needing to take smoking breaks, and at times failing to participate fully in the visits. She successfully completed parenting classes but did not implement her knowledge at the visits. Testing revealed limited knowledge of parenting issues, but Jeri did show improvements in the area of parenting skills and her knowledge of sexual offenders through the services offered her by DCFS.
At visits with M.F., Jeri could feed and diaper the child but sometimes needed direction or prompting from the caseworker or her mother, who was usually present. Jeri did not always take kindly to the suggestions and indicated her displeasure by throwing a kitchen rag on the table. At times Jeri needed to smoke a cigarette to relieve her tensions and would go outside to do so, as she was instructed by DCFS not to smoke in M.F.'s presence.
The totality of the evidence indicated Jeri is not capable of assuming a parenting role without supervision. Her schizophrenia makes her unable to fully recognize the needs of a child and respond appropriately, which could endanger a child placed in her care.
Jeri argues no evidence showed she had ever put T.R. at risk or that she could not carry out the responsibilities of a noncustodial parent. The fact Jeri had supervised visitation with T.R. and was not asking for anything more does not prevent a finding of unfitness to parent T.R. but is a factor for consideration under the best-interests portion of the termination proceeding.
Clear and convincing evidence suggested Jeri was unfit due to a mental disability which prevents her from parenting her children and this disability will continue into the indefinite future and beyond a reasonable period of time.

B.Best Interests of Minor Respondents
Once parental unfitness has been found in a proceeding to terminate parental rights, the parent's rights must yield to the best interests of the child. A.P., 277 Ill.App.3d at 598, 214 Ill.Dec. 299, 660 N.E.2d at 1011. Although a parent may be unfit to have custody of her children, it does not follow automatically the parent cannot remain the children's legal parent with the attendant rights and privileges. In re B.C., 247 Ill.App.3d 803, 806, 187 Ill.Dec. 486, 617 N.E.2d 1207, 1210 (1993). After a finding of unfitness, the trial court must still give full and serious consideration to the child's best interests. A child's best interests may be best served by maintaining an already existing relationship with a parent. A trial court's finding termination is in the children's best interests will not be reversed unless it is contrary to the manifest weight of the evidence. In re S.H., 284 Ill.App.3d 392, 401, 219 Ill.Dec. 895, 672 N.E.2d 403, 409 (1996).
At the conclusion of the best-interests evidence in this case, the trial court stated, "at this stage of the proceedings no one has the burden of proof." In our view, this is an incorrect statement of applicable law, and it has the potential for confusion.
*707 In Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), the United States Supreme Court stated "[b]efore a State may sever completely and irrevocably the rights of parents in their natural child, due process requires that the State support its allegations by at least clear and convincing evidence." Santosky, 455 U.S. at 747-48, 102 S.Ct. at 1391-92, 71 L.Ed.2d at 603. Our supreme court adopted this analysis in In re Enis, 121 Ill.2d 124, 133-34, 117 Ill.Dec. 201, 520 N.E.2d 362, 367 (1988).
Although both Santosky and Enis were dealing with the applicable standard of proof necessary in the context of an unfitness finding, the reasoning also applies to Jeri's argument the State must bear the burden of proof that termination is in the best interests of T.R. and M.F. The State filed a petition to terminate Jeri's parental rights and, as we have noted, there are two parts to this determination. First, it must be shown Jeri is an unfit person; and second, it must be shown to be in the best interests of T.R. and M.F., before her rights be terminated. The State is the petitioner and the State is required to prove both requirements of its petition to terminate Jeri's parental rights. Indeed, we have previously so stated in In re S.M., 314 Ill.App.3d 682, 247 Ill.Dec. 424, 732 N.E.2d 140, (2000): "Termination is only allowed after a separate best[-]interests hearing [citation], after which the trial court concludes the State has proved termination of parental rights is, in fact, in the minor's best interests." S.M., 314 Ill. App.3d at 685, 247 Ill.Dec. 424, 732 N.E.2d at 143.

1. As To M.F.

In this case, the trial court's termination of Jeri's parental rights to M.F. was not against the manifest weight of the evidence. M.F. was only nine months old when he was taken into protective custody and ultimately placed in foster care. The bond between Jeri and M.F. was not yet great. While M.F.'s foster parents are not potential adoptive parents, information regarding M.F. was placed in an adoption information center to find prospective adoptive families once the permanency goal was changed to termination. Ashley Evans' parental rights to M.F. were also terminated but he is not a party to this appeal. The pool of potential adoptive families is six, including Jamie and Darryl Leftwhich, Jeri's sister and her husband. Thus, because the evidence indicates it is highly unlikely Jeri will ever be able to parent M.F. without a great deal of help and supervision, and adoptive placement is available to M.F., it is clearly in his best interests Jeri's parental rights be terminated.

2. As To T.R.

As for, T.R., however, we find the evidence does not show a benefit to her in the termination of Jeri's parental rights. Jeri has not had custody of T.R. since her divorce in 1993. Instead, she has exercised visitation which, under the judgment of dissolution, occurred every other weekend for four hours on Saturday and four hours on Sunday. The visits occurred in Jeri's home. They were initially unsupervised but became supervised in 1996 after the indicated reports against Jeri's father, Jim Ferrell. Jeri and T.R. had an ongoing relationship already developed when this case began.
Nathan Bassett, a caseworker for DCFS, testified in July 2000 at the unfitness hearing it was the position of DCFS it was in T.R.'s best interests to terminate Jeri's parental rights because, if something would happen to David, T.R.'s father, and Jeri's rights were not terminated, "it could possibly cause problems." He stated T.R. had said she did not really like visiting *708 with Jeri. Bassett had only supervised one visit at that point and noted Jeri and T.R. did not seem terribly close. However, visits had been reduced to once per month about six months earlier when the permanency goal had changed to termination and had not actually occurred at all most months due to various difficulties in scheduling, none of which had been caused by Jeri.
When Bassett testified at the best-interests hearing in November 2000, he was called as a witness by David. He stated he had monitored nine visits at that time (some of which were make-ups for those missed in the first part of 2000). At that time, T.R. stated she "kind of liked the visits with Jeri. Bassett testified to the mother and daughter playing games, visiting the park, and talking about school. At times Jeri gave T.R. supper and at times T.R. had eaten prior to the visits. Bassett admitted he was predisposed to the termination of Jeri's parental rights. He criticized Jeri for smoking 3 to 12 cigarettes per visit, a visit where Jeri interrupted T.R.'s homework with questions, and one visit where T.R. was ready to leave early when David arrived early to pick her up. However, as was brought out in cross-examination, T.R. was used to the visits with her mother as they had been going on for several years before DCFS became involved in this case. It was only natural she would be willing to leave her mother at the end of the visits without expressing regret because she knew she would see her again. This situation was not like those where children were new to foster care and visiting with parents and they were not sure when they would see them again. Bassett also claimed T.R. was afraid Jeri might take her and leave her someplace or she might take her to see her grandfather, Jim Ferrell.
David and his mother testified they thought it would be best to terminate Jeri's parental rights and stated T.R. stated she did not really like visiting Jeri.
T.R. was interviewed by the trial court in camera. Attorneys for all parties were present. At that interview, T.R. stated she liked visiting with Jeri and did not want to see the visits terminated.
The State characterized T.R. and Jeri's relationship as lacking depth. That is a problem which can occur with any child's relationship with a noncustodial parent after a divorce. The evidence also indicated Jeri loved T.R. and had worked at fostering their relationship despite her mental disability and through persevering in her visitation despite the obvious animus against the visits expressed by her former husband, his mother, and the DCFS caseworker.
The evidence indicated T.R. and Jeri had an ongoing relationship which existed from the time of the divorce in 1993. There was no showing of a benefit to T.R. by the termination of Jeri's parental rights. T.R. would not gain any more stability in her life because there was no prospect of adoption and she already lived with David, who had full custody and guardianship. In fact, the evidence indicated David himself had added instability to T.R.'s life by living with four different women over the eight years since the divorce. One relationship resulted in a child born before David and her mother were married and later divorced.
Jeri's visits with T.R. were supervised and no one was suggesting they be otherwise. Therefore, there was no risk of harm to T.R. despite Jeri's lack of solo parenting skills. As no benefits were shown to be gained by termination, the only result was to deprive T.R. of an already established relationship with her mother. Visitation as it previously existed, *709 four hours on alternate Saturdays and Sundays, benefitted T.R. in preserving a relationship with her mother, a noncustodial parent who loved her child and was only prevented from a more hands-on relationship by her mental disability. The evidence did not establish that it would be in T.R.'s best interests to terminate respondent's parental rights.

C. Ineffective Assistance Claim
Jeri's final contention on appeal is she received ineffective assistance of counsel. She bases her argument on the fact counsel presented no evidence at the conclusion of the State's evidence on fitness (other than a stipulation she did not stab her father with a knife) and presented no evidence on the issue of best interests of her children.
In a termination of parental rights proceeding, parents are entitled to effective assistance of counsel. In re R.G., 165 Ill.App.3d 112, 127, 116 Ill.Dec. 69, 518 N.E.2d 691, 700 (1988). The standards for determining ineffective assistance of counsel were set forth in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). A respondent must show her counsel's representation fell below an objective standard of reasonableness and there is a reasonable probability the result would have been different had there not been ineffective assistance of counsel. To demonstrate prejudice, respondent must show a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different. Strickland, 466 U.S. at 687-95, 104 S.Ct. at 2064-69, 80 L.Ed.2d at 693-98. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." In re A.R., 295 Ill.App.3d 527, 531, 230 Ill.Dec. 391, 693 N.E.2d 869, 873 (1998).
The fact counsel did not present any witnesses is not in itself indicative of ineffective assistance. The issue at the fitness portion of the hearing was very narrowJeri's mental state. She herself admitted the impairment and all medical evidence supported it. Dr. Traver was subjected to rigorous cross-examination by Jeri's counsel as well as other counsel. Dr. Traver's testimony agreed with Jeri's own medical records, prepared by Dr. Damera. Both doctors agreed to Jeri's mental condition and that her prognosis for progress, let alone recovery, was poor. Their opinion was Jeri's inability to discharge parental responsibility would extend beyond a reasonable period of time. Such a prognosis need not be absolutely conclusive to satisfy the requirement of the statute the impairment will extend beyond a reasonable period of time. See J.A.S., 255 Ill.App.3d at 824, 194 Ill.Dec. 433, 627 N.E.2d at 772.
Counsel's entry into the stipulation was actually an effective move, as it prevented further testimony into an unfortunate incident where Jeri apparently attacked her father with a knife at a time when her medications were not correct. More details of the incident could have hurt Jeri's cause. Counsel also presented lengthy closing argument.
As for the best-interests portion of the proceeding, counsel again engaged in cross-examination of all witnesses, made objections and presented closing argument. The lack of presentation of evidence can be attributed to trial strategy and any error in such strategy alone does not establish ineffective representation. R.G., 165 Ill.App.3d at 128, 116 Ill.Dec. 69, 518 N.E.2d at 701. No prejudice to Jeri can be shown by counsel's failure to produce evidence.

*710 III. CONCLUSION
For the foregoing reasons, we affirm the trial court's finding of unfitness and its finding it was in M.F.'s best interests Jeri's parental rights be terminated. We reverse the trial court's finding it was in T.R.'s best interests to terminate Jeri's parental rights and remand so that the visitation which previously existed prior to the filing of the petition to terminate may be reinstated and such visitation be resumed.
Affirmed in part and reversed in part; cause remanded with directions.
COOK and TURNER, JJ., concur.