# Illinois Official Reports

## Appellate Court

---

### *In re I.W.*, 2018 IL App (4th) 170656

---

| | |
|---|---|
| Appellate Court Caption | *In re* I.W., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. Danial W., Respondent-Appellant). |
| District & No. | Fourth District<br>Docket No. 4-17-0656 |
| Filed | February 21, 2018 |
| Decision Under Review | Appeal from the Circuit Court of McLean County, No. 16-JA-35; the Hon. Kevin P. Fitzgerald, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Lora A. Keller, of Cover, Evans & Fricke, LLP, of Bloomington, for appellant.<br><br>Jason Chambers, State's Attorney, of Bloomington (Patrick Delfino, David J. Robinson, and John Zimmerman, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE STEIGMANN delivered the judgment of the court, with opinion.<br>Justice Holder White concurred in the judgment and opinion.<br>Justice DeArmond specially concurred, with opinion. |

**OPINION**

¶ 1      Respondent, Danial W., appeals the termination of his parental rights to I.W., born February 8, 2016. He argues (1) the finding of parental unfitness is against the manifest weight of the evidence and (2) he was denied effective assistance by counsel. After reviewing the record, we find no merit in either claim. Therefore, we affirm the trial court's judgment.

¶ 2                                I. BACKGROUND
¶ 3                           A. Why I.W. Came Into Care
¶ 4      On May 11, 2016, a friend who had been staying with respondent and I.W.'s mother, Sarah Z., called the police after seeing the mother throw three-month-old I.W. into a crib while having an argument with respondent.

¶ 5      I.W. was placed in the custody of the mother's sister, Rachel Z.

¶ 6                        B. Respondent's Counsel Moves for a
                     Continuance on Behalf of the Mother's Counsel

¶ 7      On June 21, 2016, the trial court held a pretrial hearing. At the beginning of the hearing, the court stated, for the record, that the mother was present with Assistant Public Defender Jennifer Patton, who was standing in for Assistant Public Defender Matthew Koetters. Assistant Public Defender Robert Keir was present with respondent. The court noted that, previously, in the shelter-care hearing, which was held on May 16, 2016, Patton appeared for respondent and Koetters appeared for the mother. The trial court asked, "You know, so there's no issue, Ms. Patton was here for Mr. Keir the last time. Does anyone see that as an issue? Ms. Patton was here for Mr. Keir with [respondent] the last time." The attorneys and the court agreed that because nothing of substance would be addressed in the present hearing, the temporary switch would pose no problem.

¶ 8      For the record, the assistant state's attorney asked Patton:

          "MS. McLAUCHLAN: Ms. Patton, you haven't given any legal advice to [the mother], have you?

          MS. PATTON: No, Judge. I told her Mr. Koetters was out of the office and he was asking to continue the case until he returns."

¶ 9                     C. The Petition to Terminate Parental Rights
¶ 10     On March 6, 2017, the State filed a petition for the termination of parental rights. The State alleged that respondent met two of the statutory definitions of an "unfit person": (1) he had failed to maintain a reasonable degree of interest, concern, or responsibility as to I.W.'s welfare (see 750 ILCS 50/1(D)(b) (West 2016)) and (2) an intellectual or developmental disability rendered him unable to discharge his parental responsibilities (see *id.* § 1(D)(p)).

¶ 11                  D. The Mother Voluntarily Surrenders Her Parental Rights
¶ 12     On July 25, 2017, after being admonished by the trial court, Sarah Z. voluntarily surrendered her parental rights to I.W. and consented to the adoption of I.W.—but only by her

sister, Rachel Z., and her sister's husband, Jessup F.

¶ 13                    E. Psychological Opinion Testimony in the Fitness Hearing

¶ 14     On August 9, 2017, the trial court held a fitness hearing. For purposes of the hearing, the State's only theory was that respondent was an "unfit person" within the meaning of section 1(D)(p) of the Adoption Act (*id.* (intellectual or developmental disability)).

¶ 15     At the beginning of the hearing, the parties stipulated to the qualifications of Judy Osgood, a clinical psychologist the trial court had appointed to evaluate the parents. The stipulation was that "Osgood's education, training[,] and experience as a licensed clinical psychologist in the State of Illinois qualifie[d] her to testify as an expert in the field of psychology."

¶ 16     Osgood testified she met with respondent on October 4, 2016, for 2½ to 3 hours and performed a psychological evaluation. She determined that because of limitations in his cognitive abilities and academic skills, she was unable to administer all the tests she typically would have administered. Specifically, she was unable to do "standardized psychological and personality testing." She was able, however, to administer an intelligence test.

¶ 17     The assistant state's attorney handed Osgood a copy of section 1-116 of the Mental Health and Developmental Disabilities Code (Code) (405 ILCS 5/1-116 (West 2016)), which defined an "intellectual disability" as "significantly subaverage general intellectual functioning which exists concurrently with impairment in adaptive behavior and which originates before the age of 18 years." She asked Osgood if respondent had an "intellectual disability" within the meaning of the statutory definition. Osgood answered yes.

¶ 18     For one thing, respondent had "significantly subaverage general intellectual functioning." *Id.* He had a full-scale intelligence quotient (IQ) of 67, which was "at the one percentile for his age group."

¶ 19     This intellectual deficit "exist[ed] concurrently with impairment in adaptive behavior." *Id.* His reading and math skills were at the level of kindergarten or first grade. He had difficulty assimilating and applying information. Two organizations had observed and documented his extreme difficulty with learning and reasoning: The Baby Fold, where he had taken a parenting course, and Chestnut Health Systems, where he had received domestic-violence services. In the parenting course, for example, even though he did everything that was required of him, he ultimately failed the course because at examination time he was unable to understand and apply the material that had been taught. Osgood testified:

> "Not only was he unable to pass the course, [but] he was really unable to apply the information and benefit from it to assimilate the information. Based upon the report I received is that post-test that he still demonstrated a lot of the risk factors for parenting a child. Difficulties with empathy, unrealistic expectations of a child, just having difficulty understanding appropriate forms of intervention and disciplining a child."

¶ 20     Osgood saw an impairment of empathy and judgment in respondent's decision not to call the police when the mother threw I.W. into the crib. A friend, rather than he, had made the call, and he admitted to Osgood that, at the time, he never had any intention to call the police. The domestic violence the mother had inflicted on respondent himself was severe: at various times she had shot him with a BB gun and paint gun and had stabbed him. Nevertheless, he remained in a relationship with her, apparently unable to comprehend the danger to I.W.

¶ 21    In Osgood's opinion, any child left in respondent's care would be at a "high risk of harm," and because of his chronic intellectual deficit, his parental deficiencies were uncorrectable. This was a lifelong condition. According to an individualized education plan in his high school records, he was tested at age 16 and was found at that time to have subaverage intellectual functioning with impairments in speech and language.

¶ 22    Osgood's diagnoses were an intellectual disability, parent-child relational problems, and personal risk factors. In her report, which was admitted as petitioner's exhibit No. 1, she made recommendations calculated to help respondent function better in society. She believed he was incapable, however, of benefitting from services and treatment calculated to improve his performance as a parent.

¶ 23    On cross-examination, respondent's attorney asked Osgood:

"Q. [O]n page [6] of your psychiatric report, you testified that he was unable to complete standardized testing?

A. That's correct.

Q. So how were you able to administer these tests then?

A. I apologize. I meant psychological and personality standardized testing.

Q. So that didn't affect how you got these results?

A. Not for the IQ testing."

¶ 24    At the conclusion of the evidence and after hearing arguments, the trial court found, by clear and convincing evidence, that respondent was an "unfit person" within the meaning of section 1(D)(p) of the Adoption Act—that is, he had an inability to discharge parental responsibilities by reason of intellectual and developmental disability, and the inability would "extend beyond a reasonable period of time." The court remarked that Osgood, "an extremely competent and experienced clinical psychologist," had "testified qualifiedly, *** very clearly, concisely[,] and in the Court's mind very convincingly" to that effect.

¶ 25                            F. The Hearing on I.W.'s Best Interests

¶ 26    Immediately after finding respondent to be an "unfit person," the trial court heard evidence on the best interests of I.W. We need not recount all the evidence in the best-interest hearing because the only argument respondent makes regarding that hearing is that his attorney failed to cross-examine the foster parent, Rachel Z., about the termination of her parental rights to one of her own children, as revealed in a court order respondent has included in the appendix of his brief. In the present case, Rachel Z. testified essentially that I.W. was strongly attached to her and her husband and was integrated into their family. She added that they wanted to adopt her even if a stipend from the State were discontinued.

¶ 27    In addition to Rachel Z., the State called the caseworker from The Baby Fold, Reland Carter, who corroborated I.W.'s attachment to the foster parents and her well-being in the foster home. Respondent then testified on his own behalf.

¶ 28    At the conclusion of the best-interests hearing, the trial court went through the factors in section 1-3(4.05) of the Juvenile Court Act of 1987 (705 ILCS 405/1-3(4.05) (West 2016)) and found it would be in the best interests of I.W. to terminate respondent's parental rights. The court attached particular importance to the factor of permanency (see *id.* § 1-3(4.05)(g)).

¶ 29                                          II. ANALYSIS
¶ 30                              A. The Finding of Parental Unfitness
¶ 31        To validly terminate respondent's parental rights, the trial court had to make two findings in chronological order, each in a separate hearing: (1) the State had proved, by clear and convincing evidence, that he was an "unfit person" within the meaning of section 1(D)(p) of the Adoption Act (750 ILCS 50/1(D)(p) (West 2016)) and (2) the State had proved, by a preponderance of the evidence, that it would be in the best interests of I.W. to terminate respondent's parental rights, appoint a guardian, and authorize the guardian to consent to the adoption of I.W. See 705 ILCS 405/2-29(2) (West 2016); *In re M.H.*, 2015 IL App (4th) 150397, ¶ 20, 45 N.E.3d 1107.

¶ 32        Regarding the first of those findings, the finding of unfitness, section 1(D)(p) provides as follows:

            "D. 'Unfit person' means any person whom the court shall find to be unfit to have a child, without regard to the likelihood that the child will be placed for adoption. The grounds of unfitness are any one or more of the following ***:

                                                 * * *

            (p) Inability to discharge parental responsibilities[,] supported by competent evidence from a psychiatrist, licensed clinical social worker, or clinical psychologist of mental impairment, mental illness[,] or an intellectual disability as defined in Section 1-116 of the [Code (405 ILCS 5/1-116 (West 2016))], or developmental disability as defined in Section 1-106 of that Code [(*id.* § 1-106)], and there is sufficient justification to believe that the inability to discharge parental responsibilities shall extend beyond a reasonable time period. However, this subdivision (p) shall not be construed so as to permit a licensed clinical social worker to conduct any medical diagnosis to determine mental illness or mental impairment." 750 ILCS 50/1(D)(p) (West 2016).

¶ 33        The quoted definition of an "unfit person" refers in turn to definitions in the Code (405 ILCS 5/1-100 to 6-107 (West 2016)), including the definition of an "intellectual disability." Again, section 1-116 of the Code defines an "intellectual disability" as "significantly subaverage general intellectual functioning which exists concurrently with impairment in adaptive behavior and which originates before the age of 18 years." *Id.* § 1-116.

¶ 34        Osgood opined that respondent had an "intellectual disability" within the meaning of the Code and that he met the definition of an "unfit person" in section 1(D)(p) of the Adoption Act. (She also opined he had a "developmental disability," which section 1(D)(p) lists disjunctively with an "intellectual disability.") The trial court found her to be a competent, credible witness and accordingly found, by clear and convincing evidence, that respondent was an "unfit person."

¶ 35        This court will reverse the finding of parental unfitness only if it is against the manifest weight of the evidence. See *In re Addison R.*, 2013 IL App (2d) 121318, ¶ 22, 989 N.E.2d 224. "A determination of unfitness is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or the determination is unreasonable, arbitrary, or not based on the evidence presented." *Id.*

¶ 36        For essentially four reasons, respondent argues the finding of parental unfitness is against the manifest weight of the evidence.

¶ 37    His first argument is based on the following sentence from Osgood's report: "[Respondent] appears to be functionally illiterate and unable to complete standardized, psychological and personality testing with valid results." Respondent argues, "At no time [did] the State have Dr. Osgood explain how she [knew] her testing of [respondent was] in fact valid." Respondent's attorney, however, stipulated that Osgood was a qualified clinical psychologist. Being a qualified clinical psychologist would mean knowing what the prerequisites are for intelligence, social-adaptive, and achievement testing—all of which Osgood administered to respondent, despite her awareness that he was functionally illiterate. In her professional opinion, being functionally literate was a prerequisite for undergoing "standardized, psychological[,] and personality testing," but it was not a prerequisite for undergoing intelligence, social-adaptive, and achievement testing. Therefore, she administered to respondent the Adaptive Behavior Assessment System-II; the Wechsler Adult Intelligence Scale, Fourth Edition; and the Wide Range Achievement Test-3. Because Osgood was, as respondent's attorney stipulated, a qualified clinical psychologist, the trial court could have reasonably taken her word for it that functionally illiterate clients could undergo those tests.

¶ 38    Second, respondent contends that "[b]eing illiterate does not mean that a person has a mental condition." Presumably, Osgood would agree. If she thought that illiteracy equated to an intellectual disability, she would have administered to respondent a reading test instead of the Wechsler Adult Intelligence Scale, Fourth Edition. She did not diagnose him as being illiterate; she diagnosed him as having an intellectual disability. Instead of being a "mental condition" in and of itself, illiteracy was an "impairment in adaptive behavior" that "exist[ed] concurrently with" "significantly subaverage intellectual functioning." 405 ILCS 5/1-116 (West 2016).

¶ 39    Third, respondent complains that, in certain questions the State asked witnesses in the fitness hearing, the State falsely implied he was receiving supplemental security income because of an intellectual disability whereas, in reality, he was receiving social security survivor benefits. Questions, however, are not evidence, and we see no indication the trial court regarded them as such. We presume the court considered only properly admitted evidence. See *City of Chicago v. Sievert Electric Co.*, 134 Ill. App. 3d 552, 556, 481 N.E.2d 1, 5 (1985).

¶ 40    Fourth, respondent argues that even if the State proved he had a mental disability, the State failed to prove that his failure to pass the parenting course was the result of his mental disability. Actually, a trier of fact could reasonably conclude it was indeed respondent's intellectual disability that prevented him from passing the parenting course. To pass the parenting course—and, more broadly, "to discharge parental responsibilities"—respondent had to be able to assimilate and apply information. 750 ILCS 50/1(D)(p) (West 2016). According to Osgood's testimony, he had difficulty assimilating and applying information in general—not merely information in written form—and the reason was his intellectual disability. *Id.*

¶ 41    In sum, in our review of the record, we find evidence to support the trial court's finding that respondent was an "unfit person" within the meaning of section 1(D)(p) of the Adoption Act. Osgood, a clinical psychologist, administered an intelligence test and found that respondent had a full-scale intelligence quotient of 67, which, for his age group, was in the first percentile of the population. See *id.* ("supported by competent evidence from a *** clinical psychologist"); 405 ILCS 5/1-116 (West 2016) ("significantly subaverage general intellectual

functioning"). According to an individualized education plan in his high school records, respondent was evaluated on May 1, 2008, when he was 16, and at that time, he was found to have an intellectual disability and a speech and language impairment. See 405 ILCS 5/1-116 (West 2016) ("originates before the age of 18 years").

¶ 42　　The record also contains evidence of a concurrent "impairment in adaptive behavior." *Id.* Osgood writes in her report: "[Respondent] has demonstrated chronic instability in all areas of functioning[,] including periods of homelessness, unemployment[,] and unstable relationships. [He] appears to be dependent upon others for provision of his basic needs[,] including a residence." As Osgood also noted, respondent seemed impaired in his abilities to feel empathy and to use sound judgment, abilities that were essential to adaptive functioning. For all those reasons, we are unconvinced that by finding him to be an "unfit person" under section 1(D)(p), the trial court made a finding that was against the manifest weight of the evidence. See *Addison R.*, 2013 IL App (2d) 121318, ¶ 22.

¶ 43　　　　　　　　　　B. The Alleged Ineffective Assistance of Counsel
¶ 44　　　　　　　　　　　　1. *The Cross-Examination of Osgood*
¶ 45　　In a proceeding to terminate their parental rights, parents have a statutory right to counsel. 705 ILCS 405/1-5(1) (West 2016). Recognizing parents' right to counsel would be an empty gesture without a corresponding expectation that counsel render effective assistance. *In re R.G.*, 165 Ill. App. 3d 112, 127, 518 N.E.2d 691, 700 (1988). Therefore, parents have the statutory right to effective assistance by counsel. *In re C.C.*, 368 Ill. App. 3d 744, 748, 859 N.E.2d 170, 173 (2006).

¶ 46　　To adjudicate a parent's claim that he or she received ineffective assistance in a proceeding to terminate his or her parental rights, we apply the criteria in *Strickland v. Washington*, 466 U.S. 668 (1984). *R.G.*, 165 Ill. App. 3d at 127. Those criteria are twofold: (1) representation that fell below an objective standard of reasonableness (*Strickland*, 466 U.S. at 687-88) and (2) a reasonable probability that the result of the proceeding would have been different but for the objectively unreasonable representation (*id.* at 694).

¶ 47　　Respondent accuses his appointed counsel of rendering ineffective assistance in her cross-examination of Osgood in the fitness hearing. Specifically, when Osgood testified it was unnecessary for a client to be functionally literate to undergo "IQ testing," counsel "failed to inquire any further." Respondent insists that counsel should have inquired further and that further inquiry would have been fruitful for the defense.

¶ 48　　Was it objectively unreasonable of counsel to refrain from inquiring further when Osgood testified it was unnecessary for a client to be literate to undergo intelligence testing? See *id.* at 687-88; *People v. Pecoraro*, 175 Ill. 2d 294, 327, 677 N.E.2d 875, 891 (1997). An affirmative answer to that question would depend on two conditions: (1) intelligence testing was, in fact, valid only if the client was literate and (2) there is reason to suppose that, under further cross-examination, Osgood would have so admitted. The record does not appear to lend support to either of those conditions. Consequently, we are unconvinced it was objectively unreasonable of counsel to refrain from inquiring further when Osgood denied that being literate was a prerequisite to undergoing intelligence testing. See *Pecoraro*, 175 Ill. 2d at 327.

¶ 49　　Also, respondent accuses his trial counsel of rendering ineffective assistance by failing to ask Osgood, on cross-examination, "what impact [respondent's functional illiteracy] could

[have] had on other aspects of Dr. Osgood's evaluation." Again, that omission is blameworthy only if (1) respondent's functional illiteracy did in fact impact other aspects of Osgood's evaluation and (2) further cross-examination could have induced Osgood to so admit. The record appears to offer no support for either proposition. Therefore, we remain unconvinced that counsel's cross-examination of Osgood was objectively unreasonable. See *id.*

¶ 50                    2. *The Cross-Examination of Rachel Z.*

¶ 51        Respondent contends his counsel was ineffective by "fail[ing] to ask Rachel Z[.] about the termination of her parental rights to her daughter [A.S.]" Respondent requests that we take judicial notice of an order entered on March 16, 2017, in a McLean County circuit court case, in which the circuit court ended Rachel Z.'s obligation to pay child support for A.S., born in 2002. The court's stated reason for ending the child-support obligation was that "termination of parental rights [was] entered [November 22, 2016]."

¶ 52        Assuming, for the sake of argument, that the Rachel Z. in case No. 2006-F-88 is the same Rachel Z. who is the foster parent of I.W., the documents respondent has gathered from that case do not reveal why her parental rights to A.S. were terminated. That information would be crucial. Parental unfitness was not necessarily the reason, considering that (1) Rachel Z. was raising her other three children (whom she listed in the best-interest hearing) and (2) she evidently still was licensed by the Illinois Department of Children and Family Services to be a foster parent. She may well have voluntarily surrendered her parental rights to A.S. and consented to her adoption, for reasons having nothing to do with her own fitness as a parent.

¶ 53                     3. *The Alleged Conflict of Interest*

¶ 54        Respondent claims that his counsel, Patton, was in a *per se* conflict of interest in that on May 16, 2016, she represented him in a shelter-care hearing and subsequently, on June 21, 2016, represented the mother in a hearing. Respondent quotes *In re Darius G.*, 406 Ill. App. 3d 727, 738, 941 N.E.2d 192, 201 (2010): "[W]hile multiple attorneys from the public defender's office may substitute to represent the same client, the *same* attorney may not during the proceedings appear on behalf of *different* clients." (Emphases in original.) In *Darius G.*, the appellate court found "a *per se* conflict of interest requiring reversal" because an attorney had "appeared on both [the] respondent's and [the minor's] behalf at different times during the same proceedings." *Id.* at 739. "Prejudice [was] presumed[,] and [the] respondent [did] not [have to] demonstrate that the conflict [had] contributed to the judgments entered against her." *Id.*

¶ 55        Actually, as the State points out, *Darius G.* is distinguishable because on June 21, 2016, in the present case, Patton appeared on behalf of a colleague in the public defender's office solely to request a continuance. She did not appear on behalf of the mother. Patton stated, on the record, that she was appearing on her colleague's behalf, and she assured the trial court she had given the mother no legal advice. In a footnote of *Darius G.*, which respondent appears to overlook, the appellate court made a critical distinction between representing the client and representing an unavailable attorney for the purpose of requesting a continuance:

> "The State asserts that Herrmann [(the conflicted attorney)] 'stepped up' at these proceedings, suggesting that he merely appeared to assist his colleagues who could not be present. To the contrary, Herrmann appeared *on behalf of* his clients. He did not, for example, represent to the court that respondent's (or [the minor's]) counsel was

unavailable and that a continuance was needed. This distinction is critical because, in the latter example, Herrmann would be representing his office or his colleague, not a client. Accordingly, there would be no conflict." (Emphasis in original.) *Id.* at 738 n.4. Because the footnote is directly on point, we reject respondent's claim of a *per se* conflict of interest.

¶ 56                                    III. CONCLUSION

¶ 57        For the foregoing reasons, we affirm the trial court's judgment.

¶ 58        Affirmed.

¶ 59        JUSTICE DeARMOND, specially concurring:

¶ 60        While I agree with the conclusion because of the extremely high hurdle of overcoming the manifest weight of the evidence standard, I strongly disagree with the way in which the finding of unfitness was obtained. This case began with a clear understanding by all parties involved regarding the parents' developmental and/or cognitive delays. Trial courts and the State should pay special attention to these cases to ensure the Department of Children and Family Services (DCFS) has made reasonable accommodations in providing services to aid parents in family reunification, as the Americans with Disabilities Act of 1990 (ADA) (42 U.S.C. §§ 12101 to 12213 (2012)) and section 504 of the Rehabilitation Act of 1973 (section 504) (29 U.S.C. §§ 701 to 794 (2012)) demand, which simply was not done in this case.

¶ 61        Here, the DCFS shelter-care report filed May 16, 2016, the same date the original petitions for adjudication of wardship were filed, stated "Child Protection Specialist noted that Sarah [Z.] [(the mother who subsequently voluntarily surrendered her parental rights)] has cognitive delays. Sarah [Z.] is unable to state what her delays are other than a speech impediment. [Respondent] is reported to have significant cognitive delays as well." So, it was known to DCFS, as well as the trial court, by the day the case began that respondent may have "significant cognitive delays."

¶ 62        The family service plan dated June 8, 2016, noted "The parents are cognitive [*sic*] delayed and needs [*sic*] parenting/coaching classes." In her report, caseworker Alissa Baertsch said she would be referring both to individual therapy, to couple's therapy, and for a psychological assessment.

¶ 63        Interestingly, she also stated the parents were "being referred for a psychological assessment due to their low level of functioning in order to determine if they can appropiately [*sic*] parent and care for their daughter." There is no indication a reason for the referral, or a goal of the assessment, was to determine what necessary accommodations may need to be made to assist them in participating in and successfully completing services. She noted both parents were willing to participate in services and work toward reunification.

¶ 64        According to the family service plan, the start date for measuring the parents' performance was June 8, 2016, with a target completion date of December 8, 2016. By that time, respondent was expected to complete the parenting class successfully, cooperate with and attend individual therapy, be cooperative in sessions and put what he learns into practice, obtain a mental-health assessment and follow all recommendations of the assessment, address anger-management concerns in individual therapy, participate in couple's counseling, obtain a

- 9 -

psychological assessment (separate from the mental-health assessment referenced above), obtain a domestic-violence assessment, maintain suitable and stable housing and employment, attend visitations, cooperate with The Baby Fold and all outside service providers, as well as meet with the caseworker regularly.

¶ 65    At the July 27, 2016, final pretrial hearing, the trial court noted the parties were tendering an agreed order for psychological evaluations of the parents, and the matter was continued to August 17 for another final pretrial hearing and the adjudication was set for August 24, 2016. At the adjudicatory hearing on August 24, 2016, when questioned by his counsel, respondent said he had individualized education plans while attending school, but they were for speech only and he was otherwise "mainstreamed." This did not correspond with the observations of other reporters, who perceived respondent to have significant cognitive issues.

¶ 66    When the child protection specialist, Patricia Shannon, testified to her involvement with the parties, although admitted by the trial court for a limited purpose, she indicated medical personnel familiar with respondent and the mother had expressed their concerns to her about the mental abilities of both parents and described them as having the mental capacity of "a child."

¶ 67    The trial court found the State had failed to prove the dependency allegations regarding respondent based on cognitive delays or disabilities but found the allegations to be proved against the mother, as the evidence of her cognitive issues was substantially greater.

¶ 68    The dispositional hearing set for September 27 was continued to November 15 to allow both parents time to obtain the psychological evaluations, which had been previously ordered on July 27, 2016. Even though the caseworker noted in June 2016 she was making a referral for them, as of September, it still had not taken place. Nothing in the record indicates either parent was objecting or refusing to obtain the evaluation voluntarily; however, no order was tendered until July 27, 2½ months after case opening. No evidence in the record shows any service provider was investigating necessary accommodations.

¶ 69    The dispositional report filed September 15, 2016, indicated respondent "has completed a nurturing and parenting class through The Baby Fold however his scored [*sic*] did not show enough of an increase for him to have passed the class." The report gives no indication regarding the nature of the accommodations, if any, which were made for respondent in order for him to complete the class. By the time of the dispositional hearing, the psychological evaluation had not yet been completed.

¶ 70    According to the dispositional report, respondent attended three sessions at Chestnut Health Systems to complete a mental-health assessment; however, it could not be completed due to respondent "giving conflicting information at each appointment. The therapist reported that she is going to wait until the psychological [assessment] is completed and then write her assessment." What did that mean? What was the nature of the "conflicting information" that would make it impossible to complete a basic mental-health assessment, especially in light of the apparent and obvious cognitive delays observed by Dr. Osgood in October? The report writer said respondent's intellectual functioning appeared to be below average. The report writer's impression of respondent was as follows:

> "He has cognitive delays which may negatively impact his ability to parent in a safe and effective manner. He is angry about [I.W.'s] placement and would like her to be moved with his extended family. He appears to love his daughter and desires what is best for her. [Respondent] is participating in parenting education; he explained that,

- 10 -

while he struggles with the homework, he continues to desire to learn the information that is being taught. [Respondent] appears motivated, willing to cooperate and dedicated to reunification with his daughter."

¶ 71    However, by the time of the September 15, 2016, dispositional report, respondent had yet to receive either a mental-health assessment or a psychological evaluation, but he had been attending the various classes he was expected to attend. The record gives no indication any accommodations were made for him in any of these classes.

¶ 72    Respondent had been found to be cooperative with The Baby Fold and had attended all classes, sessions, and visits. The record gives no indication he was provided any sort of assistance during visits to help him implement the things he was being taught in the parenting classes or anywhere else. According to the report, he continued to be cooperative with The Baby Fold and all outside service providers, and he was "willing to complete anything that was asked of him."

¶ 73    The report noted how respondent had yet to complete the psychological assessment and, once done, "the agency will be able to better recommend necessary services." The clear import of this notation, which was never contradicted through testimony, was until the psychological evaluation was completed, no accommodations would be made to assist respondent with his participation in the required classes.

¶ 74    At the November 15, 2016, dispositional hearing, respondent's counsel argued for additional time but did not seek, nor did anyone else, assistance or accommodations in any of the services offered to respondent in order to facilitate parenting. The trial judge, however, recognized the need to allow respondent more time, stating "I don't think there's any question that these parents will do everything that they can to try to regain custody. The issue is whether they can or not. I think that I'm not willing at this point to give up on that possibility."

¶ 75    The December 6, 2016, family service plan (which the trial court found appropriate in its dispositional order) noted both parents completed the "Nurturing and Parenting Class" through The Baby Fold; however, "neither of them had made enough progress in the class to successfully complete the class." It then went on to note:

> "It is recommended that they received [*sic*] one on one parenting. The worker is looking for a class that would be able to give the time and assistance needed in order for [respondent] and Sarah to gain an understanding of parenting."

¶ 76    This was the first indication any effort was being made to assist respondent, whom the DCFS psychologist had indicated in October was in need of assistance. By now, the child had been in care for seven months, and during that time, nothing had been done to accommodate the special needs of this parent.

¶ 77    Perhaps most confusing is a notation in the service plan, which noted respondent "completed a Mental Health Assessment with Nancy Duffy through Chestnut Health Systems on 9/23/16. It was recommended that he undergo a Psychological assessment as well as participate in trauma informed individual counseling." This was the mental-health assessment DCFS had previously indicated could not be completed due to respondent's inconsistent responses, and because of which, DCFS was going to wait until the psychological evaluation was done before performing.

¶ 78    However, it appears DCFS decided to go ahead and do the mental-health assessment, which, amazingly, recommended a psychological evaluation—probably like the one already scheduled to take place approximately two weeks later.

¶ 79    The plan went on to note as follows:

> "[Respondent] also completed a Domestic Violence with Todd Smith at Chestnut on 11/2/16. It is recommended that [respondent] attend [i]ndividual sessions to address domestic violence topics rather than group classes due to his intellectual limitations. Nancy and Todd will determine whether these two services will be put together into one treatment plan and be handled by one therapist or whether they will meet with [respondent] separately for each service."

¶ 80    Once again, this was the first indication any accommodation was being sought. However, none of it related to parenting or nurturing skills, which were considered by the trial court to be the most important, and the reason why it agreed to allow additional time before considering a goal change.

¶ 81    In explaining the reasons for the permanency goal of return home pending a status hearing, the report noted: "While both [respondent] and Sarah are willing to participate in services and are cooperative with the agency, there is concern due to their cognitive functioning level as to whether they are capable of appropriately parenting [I.W.] and being able to keep her safe and meet her needs."

¶ 82    Yet, as of the date of the report, nothing had been done to provide any level of accommodation or assistance to achieve the goal. The plan noted the recommendations of Dr. Osgood and listed the nature of services that might be of assistance, but the report indicated counseling services had not yet begun "due to the therapists deciding the best way to proceed." Throughout this report, as well as all the others, it was noted respondent was fully cooperative, fully participating, and wanted to pursue reunification. Instead, DCFS decided he would be set up for individual sessions to address domestic-violence issues, and referrals were going to be submitted.

¶ 83    During this evaluation period, other than housing, respondent was listed as satisfactory on everything except individual therapy and parenting. The reason for the "unsatisfactory in individual therapy" was because DCFS had not yet set it up. Respondent "has not yet started sessions as Chestnut is determining the best plan for services moving forwards." The reason for the unsatisfactory rating in parenting was because respondent "did not make enough progress in Nurturing and Parenting Class in order to successfully complete it. The worker *is trying* to locate a one on one parenting class to refer [respondent] for so that the class can be catered to [his] specific needs." (Emphasis added.) He was therefore rated unsatisfactory, both for goals for which he was provided no service, and for a goal for which everyone in the case had agreed he needed accommodation.

¶ 84    According to the report, respondent attended every visit, displayed appropriate behavior during the visits, and played and interacted appropriately with I.W. He never canceled a visit, and he arrived late for only one. When they discussed his parenting classes, it was noted that respondent "has done a good job of using techniques he learned during parenting classes when he visits with [I.W.]"

¶ 85     By the time of the December family service plan, nothing had yet been done to make accommodations for the most important class respondent was being offered—that of nurturing and parenting the child.

¶ 86     The court-appointed special advocate (CASA) report, filed February 28, 2017, indicated the caseworker had met most recently with respondent on February 15, and at that time he was still on a waiting list for individualized parenting classes through the Center for Youth and Family Solutions (CYFS). He was attending domestic-violence counseling and individual counseling with Chestnut Health Systems, but he had yet to receive the specialized assistance needed for the most important issue and the one upon which the State was going to base its termination petition. According to the CASA representative, her issues with respondent appeared unrelated to parenting but to external issues such as his family support system or relationships.

¶ 87     As of the date of the permanency report filed March 1, 2017, respondent was still on the waiting list for individual parenting classes through CYFS. He had yet to receive the accommodations to which he was entitled for services before terminating his parental rights.

¶ 88     I recognize the State proceeded to termination based solely on the report of the psychologist. However, before that decision was to be made, since DCFS and the trial court were requiring respondent to participate in services and tracking his performance in them, both the ADA and section 504 required DCFS to make all necessary accommodations in services first. If, after making that good-faith effort, the ultimate conclusion was that respondent was unable to safely parent a child, then termination might have been in order.

¶ 89     Title II of the ADA (Title II) provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by such entity." 42 U.S.C. § 12132 (2012). A child-welfare agency or trial court may not engage in any practice or administration of a program in such a way as to "have the effect of discriminating on the basis of disability, or that [has] the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of the child welfare agency's or court's program for persons with disabilities." U.S. Dep't Health & Human Servs. & U.S. Dep't Justice, Protecting the Rights of Parents and Prospective Parents with Disabilities: Technical Assistance for State and Local Child Welfare Agencies and Courts Under Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act (Aug. 2015), https://www.ada.gov/doj_hhs_ta/child_welfare_ta.html.

¶ 90     As that publication notes, individuals with disabilities must be provided with opportunities to benefit from participation in "child welfare programs, services, and activities that are equal to those extended to individuals without disabilities," as well as the necessary "aids, benefits, and services different from those provided to other parents and prospective parents where necessary to ensure an equal opportunity to obtain the same result or gain the same benefit, such as family reunification." *Id.* "[S]ervices must be adapted to meet the needs of a parent or prospective parent who has a disability in order to provide meaningful and equal access to the benefit." *Id.*; see also 28 C.F.R. § 35.130(b)(1)(ii)-(iv) (2015).

¶ 91     Title II requires child-welfare agencies to make all reasonably necessary modifications to programs or activities to allow disabled participants to fully engage, furnish auxiliary aids and services where necessary to ensure effective communication, administer services in the most integrated setting appropriate to the needs of the disabled participant, and provide, as needed,

services or advantages beyond those required by regulation to people with disabilities. Nat'l Council on Disability, *Ch. 5: The Welfare System: Removal, Reunification, and Termination*, Rocking the Cradle: Ensuring the Rights of Parents with Disabilities and Their Children, https://ncd.gov/publications/2012/Sep272012/Ch5 (last visited Jan. 22, 2018).

¶ 92        Here, although everyone was aware of respondent's cognitive deficits, and in spite of the trial court's expressed indication more time should be given in order to provide services to respondent in a manner he could understand, nothing was done to facilitate services regarding parenting or nurturing at a level respondent could comprehend. In fact, nothing at all was provided in that regard by the time of termination that related in any way to his ability to parent the child.

¶ 93        If termination is allowed in this fashion, we do not need to offer disabled persons an opportunity to participate in services; we may simply rely upon the opinion of the psychologist who says they are unable and will always be unable, and let it go at that. I am mindful the testimony of an expert may be sufficient to establish unfitness under section 1(D)(p) of the Adoption Act (750 ILCS 50/1(D)(p) (West 2016)). See *In re R.M.B.*, 146 Ill. App. 3d 523, 496 N.E.2d 1248 (1986) (although even more evidence was presented regarding the parent's performance during the pendency of the case); *In re E.J.F.*, 161 Ill. App. 3d 325, 514 N.E.2d 544 (1987) (which again included more evidence of the parent's performance). For what purpose do we require parents to cooperate and participate in services if not to show either they are capable (or willing) to do so, or not? If a finding is based solely on the testimony of the expert, there is no need to offer services in the first place. Once the opinion is rendered, the State should be able to proceed to termination. Why is the State not allowed to proceed to expedited termination except under special and limited circumstances? Because the parent is permitted a reasonable period of time to show compliance or ability, all of which then gets weighed by the trial court if the State decides to proceed to termination.

¶ 94        The March 2017 petition to terminate parental rights alleged, in subparagraph 7(a), respondent was unfit under section 1(D)(b) (750 ILCS 50/1(D)(b) (West 2016)) in that "he has failed to maintain a reasonable degree of interest, concern, or responsibility as to the minor's welfare." Paragraph 7(b) alleged the inability to discharge parental responsibilities due to intellectual developmental disabilities (*id.* § 1(D)(p)), and at the outset of the hearing, the State indicated it was proceeding only on paragraph 7(b).

¶ 95        The State was therefore required to show respondent had "an inability to discharge parental responsibilities by reason of intellectual and developmental disability" and that inability would extend beyond a reasonable period of time. The State's evidence, excluding various documents of which it asked the trial court to take judicial notice, was based solely on the testimony of Dr. Osgood. One might surmise one reason why no evidence was presented regarding his progress in any services geared toward parenting was because DCFS, although aware of his cognitive deficits, never provided an accommodated program of parenting or nurturing classes throughout the life of the case from which to gauge his ability to do so.

¶ 96        Having established a permanency goal of returning I.W. to the home at the outset of the case, DCFS, in order to provide respondent the opportunity to comply, was obligated to provide the necessary services, after which the State, and ultimately the trial court, could determine whether the inability existed, to what extent, and for what duration. The court was not required to rely on the testimony of the doctor any more than it was required to rely on the testimony of any other witness.

¶ 97 The State has the burden of proving unfitness by clear and convincing evidence. *In re J.G.*, 298 Ill. App. 3d 617, 627, 699 N.E.2d 167, 174 (1998). By the language of the statute, "competent evidence from the designated category of experts must show the parent suffers from a mental disability which prevents him or her from discharging his parental responsibilities." *In re M.F.*, 326 Ill. App. 3d 1110, 1114, 762 N.E.2d 701, 705 (2002). The State was then required to present sufficient evidence to conclude the inability to discharge parental responsibilities would extend beyond a reasonable time. *In re J.A.S.*, 255 Ill. App. 3d 822, 824, 627 N.E.2d 770, 771 (1994).

¶ 98 Courts upholding the termination of parental rights have generally been provided more information than merely that of the mental-health expert in order to determine the second prong, *i.e.*, the duration of the likely inability to parent. For example, in *M.F.*, 326 Ill. App. 3d at 1114, this court had before it a parent with a diagnosis of schizoaffective disorder and paranoid schizophrenia where a licensed clinical psychologist both examined the mother and reviewed the notes of her treating psychiatrist. The notes revealed previous suicide attempts, unusual behavior, bizarre mood swings, delusions, and hallucinations extending over a 10-year period. *Id.* There was, however, additional testimony regarding her behavior during visits and her performance in parenting classes. *Id.* at 1115.

¶ 99 In *J.A.S.*, 255 Ill. App. 3d at 824, it appears the only evidence of unfitness came from a clinical psychologist. However, the diagnosis was chronic schizophrenia, disorganized type, and the respondent dealt with a long-term mental illness. *Id.* Further, the psychologist concluded the respondent's inability to function as a parent could endanger the child if placed in her care. *Id.*

¶ 100 *R.M.B.*, 146 Ill. App. 3d 523, dealt with a parent who was mildly mentally retarded and paranoid schizophrenic. The trial court relied not only on the testimony of a psychologist who both tested and interviewed the parent but also the testimony of DCFS workers regarding her performance at visitations and in programs offered to assist her. *Id.* at 526. The court specifically noted not only the mental limitations of the parent but also the efforts that had been made to assist her in acting in a more mature and responsible way toward her child, including parenting programs. *Id.* at 528.

¶ 101 *E.J.F.*, 161 Ill. App. 3d at 330, involved the termination of parental rights under paragraph 1501(D)(p) of the Adoption Act (Ill. Rev. Stat. 1985, ch. 40, ¶ 1501(D)(p)), which was substantially similar to the statute at issue here. There, the trial court heard the testimony of a psychiatrist from McFarland Mental Health Center (Center), where the respondent had been previously treated for paranoid schizophrenia. *E.J.F.*, 161 Ill. App 3d at 331. Another physician from the Center testified to the mother's mental-illness issues as well. *Id.* She had a history of hospitalizations and was not considered capable of functioning outside of a supervised living situation. *Id.* Their opinions were based on over four months of evaluation. Even there, the court considered evidence of her lack of cooperation with offered services. *Id.* at 329.

¶ 102 In *In re J.P.*, 261 Ill. App. 3d 165, 168, 633 N.E.2d 27, 36 (1994), a clinical psychologist, Dr. Marty Traver, testified the mother was determined to be mildly mentally retarded and, although she had "all the physical actions of a schizophrenic and exhibited characteristics of bipolar manic-depressive disorder," she did not warrant such a diagnosis. She was considered to meet the definition of both mental retardation and developmental disability. *Id.* at 169. Dr. Traver further opined the mother's inability to parent would extend beyond a reasonable period

of time. *Id.* The mother was also examined by a psychiatrist, who reported findings consistent with Dr. Traver. *Id.* There was also evidence presented from the caseworker and a home interventionist about the mother's progress, in addition to notation by the caseworker of the various visual and auditory hallucinations the mother reported experiencing. *Id.* at 171-72.

¶ 103 Our supreme court was asked to consider the constitutionality of subparagraph (p) in *In re R.C.*, 195 Ill. 2d 291, 297, 745 N.E.2d 1233, 1238 (2001). Finding the statute constitutional, the court, while discussing the second element regarding the persistent nature of the parent's mental condition, noted "evidence demonstrating that the parent could become able to discharge his responsibilities should be considered, even in the absence of evidence that the germinal mental condition could itself be cured or eradicated." *Id.* at 307.

¶ 104 It would therefore seem, where the State is proceeding not necessarily on a basis of mental illness, but on a mental disability, courts upholding termination require more information of a respondent's ability to parent than simply the opinion of the mental-health expert. That would only make sense. What would be the best way to either corroborate or question the expert's opinion about future events? How the parent performed with regard to services offered could give important insight into whether, although developmentally disabled, the parent was capable of learning the necessary parenting skills and applying them to their own child in a controlled environment like visitations.

¶ 105 Here, in the family service plan dated December 6, 2016, it was noted in his participation with the parenting and nurturing class, respondent was doing "a good job" of applying what he had been learning during class when interacting with his child. This was true even though he was unable to pass the test at the end of class.

¶ 106 The United States Supreme Court has stated "the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000); see also *Santosky v. Kramer*, 455 U.S. 745, 753 (1982) (stating "parents retain a vital interest in preventing the irretrievable destruction of their family life"). Our supreme court has also recognized "a parent's liberty interest in raising children." *In re M.H.*, 196 Ill. 2d 356, 362, 751 N.E.2d 1134, 1139 (2001). Because of the fundamental nature of that right, "the State must bear a heavy burden if it wishes to sever parental rights without the parent's consent." *In re Tekela*, 202 Ill. 2d 282, 298, 780 N.E.2d 304, 313 (2002). Considering the circumstances of parents like respondent in this case, the First District has stated:

> "Courts do not, and indeed should not, lightly terminate parental rights or summarily dismiss a mentally ill person's rights. The unfitness of a mentally ill parent is grounded on the parent's inability to discharge parental responsibilities, not the parent's inability to control her conduct." *In re A.J.*, 269 Ill. App. 3d 824, 828-29, 646 N.E.2d 239, 242 (1994).

¶ 107 The court then commented on the length of time taken by the State to assist the respondent in that case, noting the "State agency's goal was to reunite respondent with her children. In that regard, the State marshalled the resources available to it to address her mental condition, care for her children and attempt to reunite their family." *Id.* at 829.

¶ 108 It is truly unfortunate such was not the goal in this case.

¶ 109 The State needed the testimony of the expert to seek termination of respondent's parental rights on the basis of his intellectual and developmental disabilities. It should not have been

dispositive. If, for example, Dr. Osgood testified as she did in this case, but for the sake of argument, all reports, therapists, and counselors said respondent was fully able to parent his child safely, would the trial court have been required to find respondent unfit?

¶ 110    I may be forced to agree with the fact that, as the question was framed by the majority, the trial court's determination may not constitute "manifest error." However, when it is found DCFS has failed to provide any of the necessary accommodations with which to assess a parent's ability to adequately parent their child, it is manifestly unjust and unreasonable under the circumstances to find the parent unfit until that opportunity is provided.

¶ 111    Here, once Dr. Osgood rendered her opinion, nothing was ever done to accommodate respondent—no parenting education or assistance was ever provided. He was still on the waiting list at the time of termination. DCFS simply ran out the clock and then relied solely on the testimony of the doctor. This decision is, in my opinion, rendered even more unreasonable by the fact the record indicated he was employed, paid his own bills, and provided for himself and his family before DCFS intervention and there was testimony at the termination hearing regarding his care for two young nieces from time to time.

¶ 112    Respondent was obligated, by order of the trial court, to cooperate with DCFS and comply with any service plans and correct any conditions that led to the child being placed in care. DCFS was equally obligated to make all necessary accommodations in the provision of those services, which would permit respondent an opportunity to meaningfully participate.

¶ 113    Once the decision is made for parents to participate in services in order to obtain the return of their children, failure to allow meaningful participation should preclude a finding of unfitness, except under the most extreme circumstances. Either that or the legislature should change the statute to provide for termination immediately upon the rendering of an opinion by a licensed psychologist or psychiatrist indicating the person suffers from an "inability to discharge parental responsibilities by reason of intellectual and developmental disability" and that the inability would "extend beyond a reasonable period of time."

¶ 114    Otherwise, we are abdicating our responsibility as judges to the decision of the psychologist. We have gone from using the psychologist's opinion as the threshold for an allegation of unfitness to dispositive evidence. As long as a trial court is permitted to rely upon that expert opinion alone, without requiring DCFS to make any meaningful effort to provide parents with the opportunity to either succeed or fail in services modified to allow for the accommodations to which they are entitled by law, there is no impetus for change.

¶ 115    It is for this reason I specially concur in this case.