2025 IL App (1st) 250467

FIRST DIVISION
December 15, 2025

No. 1-25-0467

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| *In re* A.M., a Minor, | ) | Appeal from the Circuit |
| | ) | Court of Cook County. |
| (The People of the State of Illinois, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | No. 22 JA 36 |
| | ) | |
| v. | ) | |
| | ) | |
| Tianna M., | ) | Honorable |
| | ) | Levander Smith, Jr., |
| Respondent-Appellant). | ) | Judge Presiding. |

JUSTICE HOWSE delivered the judgment of the court, with opinion.
Presiding Justice Fitzgerald Smith and Justice Cobbs concurred in the judgment.

OPINION

¶ 1   Respondent Tianna M. appeals the circuit court's order terminating her parental rights for her son, A.M. Following a parental fitness hearing, the trial court found respondent to be an unfit parent. After respondent was found to be unfit, the case proceeded to a best interests hearing at which the trial court found it was in the best interests of the child that respondent's parental rights be terminated. Respondent appeals arguing that the State failed to prove her unfitness by clear and convincing evidence, that respondent's lack of progress should not be held against her because she did not receive accommodations for her intellectual disability, that the father's lack of parental fitness should not be held against her, that the trial court committed several

evidentiary errors, and that it is not in the child's best interests that her parental rights be terminated. Finding no reversible error, we affirm.

¶ 2                                    BACKGROUND

¶ 3     Respondent Tianna M. is the mother of A.M., who was born July 27, 2021. Idris D. was confirmed to be the father through DNA testing.

¶ 4     On January 13, 2022, A.M., who was 5½ months old, was hospitalized due to hypothermia. When A.M. arrived at the hospital on that January day, his clothes were soaking wet and were soiled from his own urine. His diaper was full and dirty. He had dangerously low sodium levels. In addition to hypothermia, A.M. was diagnosed with failure to thrive and medical neglect. Respondent was unable to answer medical personnel's questions about A.M.'s birth or where they were residing at the time. Medical personnel noted that respondent appeared to be cognitively impaired and lacked the capacity to care for A.M. Respondent reported that she did not know or remember how to feed A.M. appropriately. Respondent, Idris D., and Idris D.'s fiancée all presented inconsistent stories regarding the circumstances of the parents' relationship and about A.M.'s whereabouts for the preceding five months.

¶ 5     On January 24, 2022, A.M. was taken into custody by the State. The following day, on January 25, 2022, the State contemporaneously filed a petition for an adjudication of wardship and a motion for temporary custody of A.M. The circuit court appointed a guardian *ad litem* for A.M.

¶ 6     On January 9, 2023, following an adjudication hearing, A.M. was found to be neglected and abused under the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/1-1 *et seq.* (West 2022)). The circuit court found A.M. to be neglected under section 2-3(1)(a) (*id.* § 2-3(1)(a)) and section 2-3(1)(b) of the Juvenile Court Act (*id.* § 2-3(1)(b)) and also found A.M. to

be abused under section 2-3(2)(ii) of the Act (*id.* § 2-3(2)(ii)). The circuit court's decision was based on A.M.'s hospital visit, with the court noting that A.M. presented to the hospital as malnourished and unkempt. The circuit court explained that A.M. had an inadequate caloric intake, which resulted from respondent incorrectly mixing his formula, putting too much water into the mixture. Respondent admitted to mixing the formula incorrectly. The circuit court found A.M. neglected due to a lack of care and an injurious environment and abused because he was at substantial risk of physical injury.

¶ 7    The dispositional hearing was held *instanter*, and the circuit court adjudged A.M. to be a ward of the court. The circuit court placed A.M. in the custody of the Department of Children and Family Services (DCFS), giving DCFS the right to place the minor in the appropriate setting. The circuit court set the permanency goal at A.M. returning home in 12 months, pending respondent making substantial progress towards A.M.'s return home.

¶ 8    A.M. was placed with a foster family approximately two weeks after the dispositional order was entered. Clara and Christian C. became A.M.'s foster parents, and he lived with them and their other foster child. Respondent and Idris D. had a supervised visit with A.M. on February 8, 2023. During the visit, Idris D. got frustrated with A.M. because A.M. kept putting his fingers in his mouth. Christian C. tried to explain to Idris D. that A.M. was teething and it was normal for children to put their fingers in their mouth during that process. Idris D. responded in a belligerent manner with a raised and angry voice that no one could tell him what he could say to his son. A.M. threw up during the visit because respondent and Idris D. gave A.M. too much water and crackers, which was a recurring issue. Respondent took a phone call during the visit and spent 45 minutes on the phone tending to personal business. At one point in the visit,

respondent and Idris D. gave A.M. a water bottle and A.M. began to run and hide under a table. Idris D. forcibly grabbed the water bottle from A.M. and spoke to him in an angry voice.

¶ 9     The following month, A.M. had a supervised visit at the DCFS office with his maternal grandmother, an uncle, and another older relative. Respondent and Idris D. appeared at the visit unexpectedly and forced their way into the meeting room. Respondent began yelling at her mother, and Idris D. began yelling at the other people present telling them to stay away from A.M. Idris D. threatened to "break every bone" in the uncle's body. Respondent and Idris D. eventually left. When it was time for the others to leave the visit, A.M.'s grandmother and uncle were afraid because respondent and Idris D. were circling the block in their vehicle. The grandmother and uncle were afraid Idris D. might hurt them, so the police were called. Respondent and Idris D. stopped circling, and the relatives were able to leave without any further incident.

¶ 10    Following the events at the March 2023 visit, DCFS staff held a meeting and determined that Idris D. would be barred from attending future visits with A.M. In addition to his conduct at the visit where he appeared uninvited, it became known that Idris D. had active warrants for his arrest. DCFS staff decided that respondent's visits with A.M. would be moved to videoconference visits. The parents could return to in-person visits by completing domestic violence counseling. Despite Idris D. being barred from the visits, he was present in the background of several of the videoconference visits. Respondent acknowledged that Idris D. was present during some of the videoconference visits despite being prohibited from attending, but stated that Idris D. was present at the home at those times and sometimes she would converse with him during her visits with A.M.

¶ 11    As part of the goal to have A.M. returned home in 12 months, respondent and Idris D. were assigned certain services to complete. Respondent was determined to be in need of domestic violence services, individual therapy, substance abuse services, a psychiatric evaluation, parenting education, and a psychological evaluation. Idris D. was determined to be in need of domestic violence counseling, individual therapy, parenting education, and substance abuse services.

¶ 12    Respondent completed most of the services outlined in her reunification plan. Respondent did not complete the domestic violence services or parent coaching. While she attended a domestic violence class, DCFS wanted respondent to do more services in this area. Meanwhile, parent coaching requires in-person visits, and as a result of respondent's in-person visits being suspended, she could not complete the service. Idris D. completed the substance abuse evaluation and parenting classes but did not complete domestic violence services or individual therapy. The DCFS caseworker assigned to this case informed the parents that they both needed to complete the services because they were in a relationship and lived together. Respondent initially responded that she was not in a relationship with Idris D., but he said they were in a relationship, and respondent eventually admitted to being in a relationship with him.

¶ 13    The DCFS caseworker believed it was important for respondent to complete the domestic violence services so that respondent could discern what constituted a healthy relationship. The caseworker did not believe that respondent had taken accountability for why A.M. came into DCFS care.

¶ 14    When respondent completed her psychological evaluation, it was determined that she needed "disability services" and a parenting capacity assessment. Respondent underwent the parenting capacity assessment. During the assessment, respondent was asked to engage with

A.M. She became hyper-focused on having A.M. identify facial features on a picture of Mickey Mouse on the wall. She could not transition to anything else. She kept asking A.M. to look at the picture of Mickey and identify the eyes, ears, and nose. Even though A.M. had moved on and was not giving any attention to the picture, respondent would keep directing him to the same picture on the wall. Respondent was also unable to put on A.M.'s shoes, taking a long time to try to get a shoe on his foot. The DCFS caseworker described it as a "very simple shoe." Respondent was then trying to stuff A.M.'s foot into the shoe, which caused him discomfort. After respondent was unable to get the shoe on, the foster mother put it on in two or three seconds.

¶ 15    Despite DCFS identifying that respondent needed disability services, none were explicitly offered to her. A DCFS consulting psychologist also determined that the parenting capacity assessment was unreliable and should be redone. The psychologist determined that appropriate accommodations, instructions, and selection of tasks were not provided so the assessment was not credible. A follow-up parenting capacity assessment was never done. None of the services offered to respondent were specialized for people with intellectual disabilities.

¶ 16    Respondent and Idris D. frequently moved their residence while this case was pending. They often lived in hotel rooms, moving among different cities in Illinois and Indiana. As a result, DCFS personnel were not able to visit respondent and Idris D. at home.

¶ 17    In July 2023, DCFS filed a motion in the circuit court seeking authority to authorize Clara and Christian C. to move A.M. out of state as they planned to relocate to Utah. DCFS averred that it was in A.M.'s best interests to continue in the care of Clara and Christian C. The circuit court found the out-of-state placement to be in A.M.'s best interests and authorized the move.

¶ 18    On January 29, 2024, the permanency goal was changed from return home to termination of parental rights. The trial court found that A.M.'s parents "have not been engaging in all reunification services." Specifically, the court noted that neither parent had completed a domestic violence assessment or treatment. The court explained that the mother's visits with A.M. were virtual, and the father's visits were suspended because of safety concerns for A.M., including the father's active arrest warrants. The trial court found that DCFS had made reasonable efforts in providing services to facilitate the achievement of the permanency goal.

¶ 19    The State averred in its petition for termination of parental rights that, for a period of nine months, the parents "failed to make reasonable efforts to correct the conditions that were the basis for the removal of the child" and "failed to make reasonable progress towards the return of the child."

¶ 20    Before the hearing on the termination of parental rights, in August 2024, Idris D. was booked into county jail in Indiana. The case was continued multiple times to try to secure Idris D.'s appearance at the proceedings, but he refused to attend. The termination of parental rights hearing, thus, was held in his absence.

¶ 21    At the hearing on the termination of parental rights, the DCFS caseworker assigned to this case, Donielle Parham, testified that respondent failed to complete the domestic violence services that were part of the reunification plan. Parham also testified that respondent did not complete the parenting coaching services because those services can only be offered when a parent is having an in-person visit with the child. Because respondent's visits were only allowed to be virtual based on the conduct of respondent and Idris D., respondent did not complete those services. Parham testified that the parents were not consistent with visits, either missing the visits, arriving late, or leaving early.

¶ 22    Parham also described misrepresentations that were made to her by respondent during the course of her time as the caseworker on this case. Respondent was untruthful about the status of her relationship with Idris D. The parents were living together, but Idris D. refused to engage in the services outlined in his reunification plan. Parham believed that respondent's continued relationship with Idris D. was a barrier to A.M. returning home. Idris D. exhibited aggression when he appeared uninvited to one of A.M.'s family visits, made physical threats against one of A.M.'s relatives, and ultimately was incarcerated on a battery charge from Indiana. Parham believed that domestic violence services were crucial for respondent so she could understand what constituted a healthy relationship. Parham did not believe A.M. would be safe with respondent because she was still living with Idris D., was trying to lie to hide their relationship status from DCFS, and was not being truthful about domestic violence. Parham also testified that she spoke with respondent's domestic violence counselor who told her that respondent lied during the sessions about who had abused her.

¶ 23    Parham acknowledged she was aware that respondent has an intellectual disability. Parham admitted that the parenting classes and other services DCFS was offering respondent were not specifically designed for people with an intellectual disability. Parham did refer respondent to a program that provided services to people with intellectual disabilities called "DORS," which was offered through the Illinois Department of Health and Human Services. Parham also contacted a group called "ARC of Illinois" that provided services to people with intellectual disabilities. Nevertheless, the specific programs offered to respondent by DCFS were not designed for people with respondent's intellectual disability.

¶ 24    A.M.'s foster father, Christian C., also testified for the State. He testified about respondent and Idris D.'s conduct during a visit he supervised where Idris D. was raising his

voice and getting frustrated and angry with A.M. Christian C. testified that respondent spent 45 minutes of that visit on a personal phone call rather than spending time with A.M. Christian C. also testified about respondent and Idris D.'s conduct during A.M.'s visit with other family members to which they were not invited. Christian C. testified that Idris D. threatened one of the family members with physical harm and he had to call 911 because respondent and Idris D. were circling the block in their vehicle.

¶ 25    Respondent herself testified that she has had a known intellectual disability since she was three years old. She was in special education while she was in school. Respondent acknowledged that she had trouble making A.M.'s bottles when the case began, but she subsequently learned how to make them. Respondent completed the parenting class, but it was confusing and no one in the class discussed her special needs. Still, between the parenting class and her therapy, she learned a lot about being a parent such as how to be patient, how to properly discipline a child, how to change diapers, and how to prepare a feeding schedule.

¶ 26    At the time of the termination hearing, respondent had stable housing in Danville, Illinois. She secured the housing with help from Idris D. Respondent testified that DCFS did not help her get housing or programming, so she connected with an agency called Crosspoint on her own. Crosspoint had helped respondent with daily life tasks, making sure she was independent in her home, and accessing parenting classes.

¶ 27    Respondent acknowledged in her testimony that she intended to parent A.M. with Idris D. D., but she would parent him on her own if necessary. She also stated that even if Idris D. did not have custody of A.M. she would still let him see his son because "that's his dad." She acknowledged that Idris D. was not participating in the reunification services, and she understood that A.M. could not be returned to her while Idris D. was not completing the services.

During her assessments with DCFS in this case, respondent expressed a lack of trust for others, except for Idris D., as he was the only one she could really trust. At the termination hearing, respondent testified that Idris D. never abused her and she intended to marry him and reside with him in the future.

¶ 28    Deborah Scott, a domestic violence counselor, also testified on respondent's behalf. Scott testified that respondent attended several domestic violence sessions with her. DCFS caseworker Parham testified that she spoke to Scott after respondent participated in the domestic violence sessions. Scott testified that she never told Parham that respondent "lied" in her domestic violence sessions.

¶ 29    On February 27, 2025, the trial court entered an order terminating both parents' parental rights. The trial court found both Christian C. and Parham to have been credible witnesses. The trial court explained that respondent's testimony was not credible because it was contradicted by other testimony and she could not recall other important information. The trial court acknowledged respondent's efforts and noted that she completed many of the services offered but also acknowledged respondent's tardiness and inconsistency attending visits with A.M. and her continuing parental deficiencies.

¶ 30    The trial court found, by clear and convincing evidence, that respondent was unfit as a parent because she "has failed to maintain a reasonable degree of interest, concern or responsibility as to the minor's welfare; [and] She has failed to make reasonable efforts and/or progress towards reunification." After making the unfitness finding, the trial court found it to be in A.M.'s best interests to terminate respondent's parental rights. Thus, the trial court held that "[t]he parental rights of the mother are involuntarily terminated based on the above finding of unfitness and the best interests of the minor." The same findings were made with regard to Idris

D., and his parental rights were also terminated. This appeal followed. Idris D. did not appeal the termination of his parental rights as to A.M., and this appeal concerns only the respondent-mother.

¶ 31                                      ANALYSIS

¶ 32                          *Sufficiency of the Evidence*

¶ 33      Respondent argues that the State failed to prove her to be an unfit parent by clear and convincing evidence. The right of parents to the care, custody, and companionship of their children is a precious fundamental liberty interest protected by the substantive due process guarantees of the fourteenth amendment of the United States Constitution (U.S. Const., amend. XIV). *Troxel v. Granville*, 530 U.S. 57, 66 (2000); *Santosky v. Kramer*, 455 U.S. 745, 758-59 (1982). Parental rights can only be overridden when there is clear and convincing evidence that the parent is unfit. *Santosky*, 455 U.S. at 747-48; see *In re Adoption of Syck*, 138 Ill. 2d 255, 275 (1990).

¶ 34      The Juvenile Court Act (705 ILCS 405/1-1 *et seq.* (West 2022)) and the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2022)) work in concert to govern the proceedings for termination of parental rights. *In re D.F.*, 201 Ill. 2d 476, 494 (2002). For terminating parental rights, a two-step process is mandated. *Id.* "First, the State must show, by clear and convincing evidence, that the parent is 'unfit,' as that term is defined in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 1998))." *Id.* at 494-95. If the court finds a parent to be unfit, it must then consider whether it is in the best interests of the child that parental rights be terminated. *Id.* at 495.

¶ 35      Here, the trial court found respondent to be unfit under grounds (b) and (m) of the definition of what constitutes an "unfit person" under the Adoption Act. See 750 ILCS 50/1(D)

(West 2022). The trial court found respondent to be unfit under ground (b) because she failed to "maintain a reasonable degree of interest, concern or responsibility as to the child's welfare." *Id.* § 1(D)(b). The trial court found respondent to be unfit under ground (m) because she failed "to make reasonable efforts to correct the conditions that were the basis for the removal of the child from the parent during any 9-month period following adjudication" or "to make reasonable progress toward the return of the child to the parent" within any nine-month period following adjudication. *Id.* § 1(D)(m).

¶ 36     When the respondent-parent challenges the sufficiency of the evidence, a reviewing court will reverse a trial court's finding of unfitness only where it is against the manifest weight of the evidence. *D.F.*, 201 Ill. 2d at 495. Similarly, a trial court's finding that termination of parental rights is in a child's best interests will not be reversed on appeal unless it is against the manifest weight of the evidence. *In re M.C.*, 2018 IL App (4th) 180144, ¶ 35. Under the manifest weight of the evidence standard, this court will not reverse a trial court's decision unless the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence. *In re A.R.*, 2023 IL App (1st) 220700, ¶ 66. In reviewing the termination of parental rights, we will not substitute our judgment for that of the circuit court on the issues of witness credibility, the weight to be accorded the evidence, or the inferences to be drawn from that evidence. *D.F.*, 201 Ill. 2d at 499.

¶ 37     Respondent argues that the State did not provide clear and convincing proof that she lacked progress toward the return home of A.M. where she was never provided services accommodating for her known intellectual disability. Respondent argues that the record shows her successful completion of the majority of services required by her reunification plan, but her "progress" cannot be fairly or clearly assessed because she was not given services adapted to her

cognitive limitations. According to respondent, overwhelming evidence was produced that DCFS knew about her disability and her need for accommodations in the services offered, but it nonetheless failed to provide them.

¶ 38    Respondent contends that the trial court erred when it failed to weigh her disability and need for accommodations when assessing her progress in the case because the appropriate services for her were effectively unavailable. According to respondent, the process was unreasonable and fundamentally unfair as DCFS's failure to provide accommodations to respondent resulted in it not providing a reasonable path to reunify the family but instead discriminating against her because of her disability. Respondent concludes that, "in the absence of those appropriately adapted services, the trial court could not make any fair and reliable assessment of how close [respondent] was to the return of A.M., and the finding that she did not make such substantial progress is against the substantial [weight] [*sic*] of the evidence."

¶ 39    The testimony from the DCFS caseworker and the documentary evidence both show that DCFS and the State knew about respondent's intellectual disability at the outset of this case. The State does not contend otherwise. The ultimate question in determining whether a parent has made reasonable progress is not whether the parent has completed certain of the services outlined by DCFS in the reunification plan but rather whether her efforts in completing these services resulted in actual reasonable progress toward returning the minor home. *A.R.*, 2023 IL App (1st) 220700, ¶ 72.

¶ 40    The trial court's finding that respondent was unfit was based only in part on respondent not completing services offered as part of her reunification plan. In larger part, the trial court's unfitness finding was based on respondent's life choices that she has not claimed are a result of her disability. The trial court cited respondent's tardiness and inconsistency in visiting A.M.

when she had the opportunity. Respondent took a long phone call during a visit with A.M. instead of spending that time with him. In addition, without any regard to her disability, respondent continued to stand by her decision to cohabitate with Idris D., and she expressed in her testimony at the fitness hearing that she intended to marry him and would let him interact with A.M. because he was A.M.'s father even if he was prohibited from having custody.

¶ 41    At the hearing, respondent continued to insist upon parenting with Idris D. even though there had been compelling evidence that he was unfit. At a supervised visit, Idris D. acted aggressively towards A.M. At another visit where A.M. was present, Idris D. acted aggressively and threatened one of A.M.'s relatives with physical harm. With respondent in tow, Idris D. circled the block which intimidated A.M.'s relatives and resulted in the police being called to the visit location. Idris D., with respondent, was living nomadically, and his financial means were respondent's disability payments. His therapist wrote in his report that Idris D. could not be a full-time parent "even under the most generous circumstances." Idris D. had active warrants for his arrest for much of the period relevant to this case, has an extensive criminal history, and was in jail at the time of the termination of parental rights hearing. Even though he was incarcerated and had notice and an opportunity to appear at the termination of parental rights hearing, he simply refused to attend, without providing any reason.

¶ 42    While we do not seek to impart Idris D.'s parental shortcomings onto respondent, the problem is that she continues to believe that Idris D. should be able to coparent A.M. with her in a cohabitating relationship. Despite Idris D.'s demonstrated unfitness, respondent refuses to acknowledge his parenting deficiencies. At the fitness hearing, respondent acknowledged that the DCFS caseworker seemed to be conveying to her that her relationship with Idris D. was preventing her from making progress towards A.M.'s return, but she responded "why do I have

to leave the boy? Because he didn't do his services?" Respondent continued to communicate with Idris D. weekly during his incarceration. She then testified that she planned to marry Idris D. and allow him to coparent A.M., even if he was refused legal custody. Respondent's testimony shows that she failed to discern one of the central issues impeding her progress toward A.M. returning home and that she was willing to potentially jeopardize her right to parent A.M. to stand by a person who had been shown to be unfit to parent him.

¶ 43     Respondent contends that there was no evidence that Idris D. committed domestic violence against her. She contends that it is improper to base her unfitness on her decision to maintain a relationship with him, characterizing it as "imputed parental unfitness." But we have previously explained that it is relevant to a parent's fitness inquiry when that parent plans to keep the minor in the presence of an unfit parent. See *In re S.K.B.*, 2015 IL App (1st) 151249, ¶ 43 (the father's failure to recognize the significance of the mother's mental illness showed a lack of progress towards returning the minor home because it showed he did not put adequate emphasis on protecting the minor); *In re H.S.*, 2016 IL App (1st) 161589, ¶¶ 26, 29 (father who continued to reside with mother who was a drug addict, failed to take prescribed medication, and failed to complete services prescribed by DCFS did not show demonstrable movement toward reunification or correcting the environment that led to the minor's removal); *In re D.J.*, 262 Ill. App. 3d 584, 590 (1994) (mother who continued relationship with unfit person, continued communication while he was incarcerated, and would have continued the relationship if he was free showed that she had chosen the unfit person over her children and showed her own unfitness). Like in *D.J.*, the trial court here focused "upon the acts and intentions of respondent," not the unfit person, and, therefore, "the trial court properly applied section 1(D)(m) of the Act." *D.J.*, 262 Ill. App. 3d at 590. There was sufficient evidence to prove respondent's unfitness

under the terms of the Adoption Act and Juvenile Court Act and respondent has failed to show that the trial court's fitness determination was against the manifest weight of the evidence.

¶ 44    The State was not required to prove the existence of domestic violence in order to prove a lack of fitness. Similarly, the State was not required to prove that Idris D. specifically posed a threat to the physical safety of A.M. Respondent claims that the State's attempts to prove her co-dependence on Idris D. are not enough to show her failure to comply with the service plan where there was no evidence of domestic violence. The State introduced evidence at trial that respondent relied on Idris D. for transportation and for assistance with performing her daily living tasks. The State also introduced evidence that Idris D. was living off of respondent's disability benefits, that he was controlling respondent about what to say during her therapy sessions, that he sometimes answered questions for her during interviews, and that she reported trusting only him. Respondent needs assistance to complete the tasks of daily living as her cognitive ability and adaptive functioning were found to be extremely low. There was evidence respondent was dependent upon Idris D., and he exerted an inappropriate level of control over her consistent with her disability.

¶ 45    The State offered evidence that Idris D. acted aggressively towards A.M. during visitation, threatened to inflict bodily harm on one of A.M.'s relatives, and was incarcerated for battery of a disabled person at the time of the termination of parental rights hearing. Even without direct evidence of domestic violence by Idris D. against respondent, it was respondent's insistence on keeping Idris D. as part of A.M.'s life that demonstrated she had not made progress with accepting conditions that would enable A.M. to return home.

¶ 46    Furthermore, the trial court's finding of unfitness could be sustained on grounds other than her failure to complete domestic violence services if we were to accept the premise that no

domestic violence, in fact, occurred. The State is not required to prove every ground it has alleged for finding a parent unfit, and a trial court's finding of unfitness will stand if supported by any one of the statutory grounds set forth in section 1(D) of the Adoption Act. *In re D.P.*, 2024 IL App (1st) 231530, ¶ 30. Idris D.'s own therapist concluded he could not serve as a full-time parent even in the most generous circumstances, but respondent insisted she would coparent with him regardless of his unfitness or the legal custody arrangement. As set forth above, there was sufficient evidence to prove respondent's unfitness under the terms of the Adoption Act and Juvenile Court Act, and respondent has failed to show that the trial court's fitness determination was against the manifest weight of the evidence.

¶ 47                      *Respondent's Claim of Discrimination*

¶ 48    Respondent argues that DCFS and the trial court discriminated against her based on her class and her disability. She contends that, as a result of the discriminatory way the case was handled, it was fundamentally unfair. Respondent states that "[i]nstead of engaging in a process to accommodate her in bolstering her parental abilities and then fairly evaluating those, the State routed her into services that were never designed for someone like her, then faulted her for a lack of progress." Respondent invokes a provision of the Americans with Disabilities Act of 1990 (ADA) (42 U.S.C. § 12132 (2018)) to suggest that she was discriminated against when DCFS failed to offer her programs to accommodate her intellectual disability.

¶ 49    "Parental rights termination proceedings are not services, programs, or activities that would subject them to the requirements of the ADA." (Internal quotation marks omitted.) *In re Jeanette L.*, 2017 IL App (1st) 161944, ¶ 17. In *Jeanette L.*, the mother argued that the reunification services she was offered were not reasonably accommodated to her developmental disability, in violation of the ADA. *Id.* ¶ 15. This court found the argument to be "meritless,"

explaining that termination proceedings are not subject to the ADA. *Id.* ¶ 17.

¶ 50    In evaluating a parent's fitness under ground (b) of the Adoption Act, our supreme court explained that "[a] parent's circumstances, such as an intellectual disability, do not necessarily or automatically redeem a parent's failure to demonstrate reasonable interest, concern, or responsibility." *In re M.I.*, 2016 IL 120232, ¶ 29. While we are primarily concerned with ground (m) in this appeal, the supreme court explained in that case that the parent's intellectual disability and poverty did not prevent the parent from consistently attending visits, but, instead, like here, the failure appeared to be the result of the parent's voluntary decision making. *Id.* ¶ 31. Further, as in *M.I.*, the trial court here was well aware of respondent's disability when it found respondent to be unfit. In both *M.I.* and here, the parent's intellectual disability was one of the focuses of the parent's defense to the State's claim that the parent was unfit. See *id.* ¶¶ 34-36. Respondent's being late or missing visits, like her decision to remain committed to Idris D., were "due to choice rather than circumstance." See *id.* ¶ 36.

¶ 51    The supreme court explained in *M.I.* that "the State has discretion to allege any ground it wishes when seeking to terminate parental rights regardless of a parent's intellectual disability." *Id.* ¶ 45. The State here focuses on the trial court's finding that respondent failed to make reasonable progress toward the return home of A.M. In furtherance of the State's position, it points out that only one ground of unfitness needs to be proven to support a parental unfitness finding. *A.R.*, 2023 IL App (1st) 220700, ¶ 66.

¶ 52    As to the inquiry of whether respondent made reasonable progress, the progress made "is judged by an objective standard based upon the amount of progress measured from the conditions existing at the time custody was taken from the parent." (Internal quotation marks omitted.) *In re Je. A.*, 2019 IL App (1st) 190467, ¶ 62. Progress is considered in light of both the

circumstances that gave rise to the original loss of custody as well as any other conditions that later become known. *D.P.*, 2024 IL App (1st) 231530, ¶ 43. We have previously explained that a respondent's personal circumstances are irrelevant to the objective analysis of whether she makes reasonable progress. *Je. A.*, 2019 IL App (1st) 190467, ¶ 73. Without specifically endorsing the view that respondent's condition is entirely "irrelevant" to the analysis, we accept that a parent with cognitive disabilities may be found to fail in making progress toward the minor's return home despite having a desire to care for the child. *A.R.*, 2023 IL App (1st) 220700, ¶ 72. A parent can be unfit without fault. *Id.* Suffice it to say, respondent's intellectual disability does not preclude a lack of reasonable progress finding.

¶ 53 To support her claim of discrimination, respondent primarily relies on a special concurrence from a case decided in the Fourth District of this court. In the case of *In re I.W.*, the specially concurring justice explained that "[r]espondent was obligated, by order of the trial court, to cooperate with DCFS and comply with any service plans and correct any conditions that led to the child being placed in care." *In re I.W.*, 2018 IL App (4th) 170656, ¶ 112 (DeArmond, J., specially concurring). The concurring justice concluded that "DCFS was equally obligated to make all necessary accommodations in the provision of those services, which would permit respondent an opportunity to meaningfully participate." *Id.* "Once the decision is made for parents to participate in services in order to obtain the return of their children, failure to allow meaningful participation should preclude a finding of unfitness, except under the most extreme circumstances." *Id.* ¶ 113.

¶ 54 However, in *I.W.*, the court was analyzing ground (p) for a finding of unfitness under the Adoption Act. See 750 ILCS 50/1(D)(p) (West 2022). Under ground (p), a parent can be found to be unfit if the parent has a mental impairment or intellectual disability that renders the parent

unable to discharge parental responsibilities for a period that extends beyond a reasonable time period. *Id.* Here, the trial court's finding that respondent was unfit was not premised on her disability. The State never alleged in this case that respondent was incapable of discharging her parental responsibilities due to her intellectual disability. Rather, in its petition seeking termination of parental rights, the State alleged that the parents "failed to make reasonable efforts to correct the conditions that were the basis for the removal of the child" and "failed to make reasonable progress towards the return of the child."

¶ 55    Even the specially concurring justice in *I.W.* concurred in the result, finding the respondent to be unfit despite the respondent not getting accommodations for the disability. *I.W.*, 2018 IL App (4th) 170656, ¶¶ 60, 110 (DeArmond, J., specially concurring). The record contains sufficient evidence to support the trial court's finding that respondent was an unfit person under the Adoption Act, and the trial court's decision is not such that the opposite conclusion is clearly evident or the finding itself is unreasonable, arbitrary, or not based on the evidence. See *A.R.*, 2023 IL App (1st) 220700, ¶ 66.

¶ 56    Respondent also relies upon *In re D.D.*, 2022 IL App (1st) 220410, ¶ 71, where we found that the services offered to the parent were "confusing, contradictory, and at times unavailable." Here, however, as discussed above, respondent's unfitness was not based solely on her failure to complete the services set out for her. Rather, there was an acknowledgement that she completed many of the services, her progress was nevertheless found to be insufficient because she failed to recognize Idris D. was unfit to parent A.M. The State and the trial court recognized that if A.M. was returned home, he would not only be returned to respondent but also to Idris D. and that situation did not exemplify progress from when A.M. was removed from their custody.

¶ 57    Respondent has not suggested that her disability was the cause of her being late or

missing visits with A.M. nor has she suggested that her disability influenced her decision to remain committed to Idris D. despite his lack of parental fitness. Respondent does not argue that her disability renders her incapable of understanding the reasons Idris D. should not be parenting A.M. within any reasonable time. Respondent similarly has not identified any basis for finding that, had she been given proper accommodations for her disability, she would have rectified the deficiencies identified by the State. Among other considerations, the trial court weighed those parental deficiencies and concluded respondent had not made reasonable progress towards A.M. returning home. See *D.F.*, 201 Ill. 2d at 499 (in reviewing the termination of parental rights, we will not substitute our judgment for that of the circuit court on the issues of witness credibility, the weight to be accorded the evidence, or the inferences to be drawn from that evidence).

¶ 58                                    *Unfitness Under Ground (B)*

¶ 59    We have determined there is no reversible error with regard to the trial court's judgment terminating respondent's rights because respondent failed to make reasonable efforts to correct the conditions that were the basis for the removal of the child and because she failed to make reasonable progress towards the return of the child. Because parental rights may be terminated upon proof of a single ground for unfitness (*In re D.D.*, 196 Ill. 2d 405, 422 (2001)), we need not consider here whether respondent also was unfit because she failed to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare under section 1(D)(b) of the Adoption Act.

¶ 60                                    *Claimed Evidentiary Errors*

¶ 61    Respondent claims that the trial court made "a number of errors" showing that it "failed to rationally apply the law to the facts under the proper burden of proof in the fitness hearing." Respondent argues that the trial court mostly focused on the credibility of the witnesses but not

the substance of their testimony and did not resolve any factual disputes. Respondent faults the trial court for "not appear[ing] to make any analysis of how it was resolving any factual disputes." However, just because the trial court did not explain its methodology for arriving at its conclusions, it does not follow that the trial court's conclusions are legally infirm. We review the circuit court's judgment, not its reasoning. *Garton v. Pfeifer*, 2019 IL App (1st) 180872, ¶ 16.

¶ 62    Respondent argues that the trial court erred when it found the DCFS caseworker to be more credible than respondent's domestic violence counselor on the issue of whether the counselor informed DCFS that respondent was lying about domestic violence in her relationship. Respondent also argues that the trial court erred when it prevented her from testifying that A.M.'s foster father, Christian C., had expressed his view that respondent could never parent. Respondent contends that Christian C. "was biased and was given undue influence over the course of the case by DCFS." Respondent also argues that the trial court erred when it found respondent to not be credible based on her admittedly poor memory but then did find her credible on her testimony regarding how she would permit Idris D. to parent A.M. despite him not having custody. Respondent suggests that the selective finding of credibility for the negative part of her testimony "underscor[es] the highly slanted nature of the court's fact-finding."

¶ 63    None of the evidentiary issues raised by respondent touch on her lack of fitness based on her decision to continue her relationship with Idris D. We may not reverse a judgment based on an allegation of evidentiary error unless plaintiff has demonstrated that the error materially affected the outcome of the trial. *Halleck v. Coastal Building Maintenance Co.*, 269 Ill. App. 3d 887, 895 (1995). The record reveals that the trial court considered the testimony and documentary evidence, weighed the evidence, made factual and legal findings, and made a considered decision on A.M.'s parentage. Along with the written order expressing its findings,

the trial court's rationale for its decision spans 10 pages of the transcript. The trial court's findings are detailed, including specific dates and specific facts that show its familiarity with the issues and the parties.

¶ 64 Respondent argues that the trial court impermissibly shifted the burden of proving fitness onto her. Respondent focuses on one comment the trial court made when delivering its ruling in which it remarked that neither respondent nor the witnesses who testified on her behalf provided the court with insight into respondent's parental fitness. It is clearly apparent that the trial court never shifted the burden of proving fitness onto respondent. Instead, the record is replete with indications that the trial court found the State to have met its burden of providing clear and convincing evidence of respondent's lack of fitness. Once the State met its burden, respondent did not provide evidence to counteract the State's proof that she was an unfit person under the Adoption Act.

¶ 65                                    *Best Interests Finding*

¶ 66 Respondent argues that the trial court erred when it determined that the termination of her parental rights was in A.M.'s best interests. After a trial court has found a parent to be unfit, the court then holds a second hearing to determine whether termination of the parental rights is in the child's best interests. 705 ILCS 405/2-29(2) (West 2022). The State must prove that it is in the child's best interests to terminate parental rights by a preponderance of the evidence, and a court's best-interest finding will not be reversed unless it is against the manifest weight of the evidence. *In re D.T.*, 212 Ill. 2d 347, 366 (2004).

¶ 67 Respondent contends that the trial court was unduly focused on the strong bond A.M. has with his foster parents and the "happy situation" A.M. is in while in his foster parents' custody. Respondent suggests that the trial court ignored the benefit A.M. would attain from a continued

relationship with his biological mother in light of her continuing improvement of her parenting capabilities. But there was evidence introduced at the best interests hearing that A.M.'s foster family wanted him to still have some contact with respondent, just not Idris D. The trial court stated that it considered all the best interests factors when it arrived at its decision, and the court does not have to mention every factor in its ruling. *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19.

¶ 68     Respondent also argues that the trial court erred when it limited her presentation of evidence about the services she was continuing to receive at the time of the best interests hearing. However, the judge presiding over the best interests hearing was the same judge who presided over the fitness hearing, and all the evidence respondent claims she should have been entitled to present was cumulative of evidence already introduced. The record makes clear that the trial court was familiar with the evidence, and the court took judicial notice of the unfitness hearing when making its best interests determination.

¶ 69     Respondent argues that private guardianship was a better option for A.M. as opposed to termination of parental rights. Section 2-28 of the Juvenile Court Act sets forth the various permanency options and goals available for children. See 705 ILCS 405/2-28 (West 2022). It was recently amended by Public Act 103-1061 (eff. Feb. 5, 2025), commonly known as the Kinship in Demand (KIND) Act, effective February 5, 2025, and respondent argues that the legislation "reordered its preferred permanency options" with guardianship now being preferred over termination of parental rights and adoption. The amendment to section 2-28 of the Juvenile Court Act does not express a preference for guardianship over termination of parental rights but rather sets the two options on equal footing. 705 ILCS 405/2-28(2.3) (West 2024). While the preamendment version of the statute expressed a preference for terminating parental rights over

guardianship, the amended version removed that preference so that, now, the court does not need to rule out termination before considering guardianship. See *id.* There is no language in the statute that requires the court to rule out guardianship before setting a termination goal. See *id.* § 2-28(2.3)(B)-(F).

¶ 70    The evidence introduced at the best interests hearing supports the trial court's decision to terminate parental rights. A.M., who was almost four years old by the time of the hearing, had lived with his foster family since he was six months old. At the hearing, the evidence showed that Clara and Christian C. provided A.M. with a safe home where he seemed to be thriving and had settled into a set routine. Clara and Christian C. had adopted another foster child from Illinois, who was almost six years old, and he and A.M. were "best friends" and "inseparable." A.M. had many friends from school and church and spent time with the foster parents' extended family. Respondent has failed to show that the trial court's finding that it was in A.M.'s best interests that respondent's parental rights be terminated was against the manifest weight of the evidence.

¶ 71                          CONCLUSION

¶ 72    Accordingly, we affirm.

¶ 73    Affirmed.

***In re A.M.*, 2025 IL App (1st) 250467**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 22-JA-36; the Hon. Levander Smith Jr., Judge, presiding. |
| **Attorneys for Appellant:** | Sharone R. Mitchell Jr., Public Defender, of Chicago (Benjamin Ginzky and Samuel Hayman, Assistant Public Defenders, of counsel), for appellant. |
| **Attorneys for Appellee:** | Eileen O'Neill Burke, State's Attorney, of Chicago (John E. Nowak and Gina DiVito, Assistant State's Attorneys, of counsel), for the People. |
| | Charles P. Golbert, Public Guardian, of Chicago (Kass A. Plain, and Christopher J. Williams, of counsel), for other appellee. |