NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2026 IL App (4th) 251123-U

NO. 4-25-1123

IN THE APPELLATE COURT

FILED
March 12, 2026
Carla Bender
4th District Appellate
Court, IL

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| *In re* E.L., a Minor, | ) | Appeal from the |
| (The People of the State of Illinois, | ) | Circuit Court of |
|     Petitioner-Appellee, | ) | McLean County |
|        v. | ) | No. 23JA80 |
| Daisha G., | ) | |
|     Respondent-Appellant). | ) | Honorable |
| | ) | J. Brian Goldrick, |
| | ) | Judge Presiding. |

JUSTICE DOHERTY delivered the judgment of the court.
Presiding Justice Steigmann and Justice DeArmond concurred in the judgment.

**ORDER**

¶ 1    *Held:*  The trial court's determination that respondent was unfit was not against the manifest weight of the evidence.

¶ 2    The State filed a petition seeking to terminate respondent Daisha G.'s parental rights as to her daughter E.L., a minor (born in 2023). The trial court found respondent to be unfit and that termination was in E.L.'s best interest, so it granted the petition and terminated her rights. On appeal, respondent does not challenge the best-interest finding, but she argues that the finding of unfitness was against the manifest weight of the evidence. We affirm.

¶ 3    I. BACKGROUND

¶ 4    A. Initial Proceedings

¶ 5    In August 2023, the State filed a petition for adjudication of wardship, alleging that E.L. was "living in an environment injurious to her welfare" pursuant to section 2-3(1)(b) of the

Juvenile Court Act of 1987 (705 ILCS 405/2-3(1)(b) (West 2022)) for numerous reasons pertaining to domestic violence, anger management, alcohol and/or substance abuse, and mental health concerns. Following the shelter-care hearing, the trial court granted temporary custody of E.L. to the Illinois Department of Children and Family Services (DCFS). The State later supplemented the petition to allege that E.L. was a newborn infant with barbiturates in her system which were not administered to her or respondent as part of medical treatment.

¶ 6          On January 18, 2024, respondent admitted the allegation that E.L. lived in an environment injurious to her welfare, as shown by a pending case involving her other child. The trial court adjudicated E.L. to be a neglected minor as defined by section 2-3(1)(b), reasoning that "[respondent] has yet to attain a fitness finding [and] has been found to not be making reasonable progress/substantial progress toward return home of her 2 prior-born children." The remaining allegations in the petition and supplemental petition were dismissed.

¶ 7          In March 2024, the trial court held a dispositional hearing, during which E.L. was made a ward of the court. She was to remain in DCFS's custody, with a goal to return home in 12 months. A plan for necessary services was established. Thereafter, the court held permanency review hearings to track respondent's reasonable efforts to regain custody of E.L.

¶ 8                              B. Petition for Termination

¶ 9          In March 2025, the State filed the petition to terminate parental rights alleging that respondent

            "is an unfit person under 750 ILCS 50/1 (D)(m)(ii) and (p), 2017, and parental
            rights should be terminated for reasons that:

                (a) She has failed to make reasonable progress toward the return of the child to
                    the parent during any 9-month period following the adjudication of

neglected, abused and/or dependent minor under Section 2-3 and/or 2-4 of the Juvenile Court Act of 1987, specifically the time frame(s) running from February 1, 2024 through November 1, 2024 (D)(m)(ii).

(b) She has an inability to discharge parental responsibilities supported by competent evidence from a psychiatrist, licensed clinical social worker, or clinical psychologist of mental impairment, mental illness or an intellectual disability as defined in Section 1-116 of the Mental Health and Developmental Disabilities Code, or developmental disability as defined in Section 1-106 of that Code, and there is sufficient justification to believe that the inability to discharge parental responsibilities shall extend beyond a reasonable time period (D)(p)."

¶ 10 The petition also brought allegations of unfitness against the biological father, Brice, who filed a separate appeal (*In re* E.L., No 4-25-1159), challenging his termination of parental rights. The facts pertaining to only his case do not need to be delineated here.

¶ 11 C. Fitness Hearing

¶ 12 The fitness hearing occurred over the course of two days in 2025, one in July and one in September. Various exhibits were entered into the record, including a psychological evaluation, portions of the transcripts from previous proceedings in the same case, records from OSF Behavioral Health, records from Chestnut Health Systems, records from Family Community Resource Center, the initial service plan, and a drug screen summary.

¶ 13 Dr. Tetyana Kostyshyna testified as to her education and experience as a licensed clinical psychologist. Without objection, the trial court recognized her as an expert in the field of psychology. She had conducted a two-hour evaluation of respondent, using a psychological test,

- 3 -

an intelligence test called Weschler Adult Intelligence Scale, Fourth Edition; a clinical syndromes and personality test called Millon Clinical Multiaxial Inventory, Fourth Edition; and a perception test called the Thematic Apperception Test. She diagnosed respondent with borderline personality disorder, alcohol use disorder, stimulant use disorder, and cannabis use disorder. The diagnosis of borderline personality disorder was based on "cutting behavior, substance abuse, suicidal thoughts, homicidal thoughts and being emotionally dysregulated." She noted that respondent received the same diagnosis years ago. She described respondent as "chronically emotionally unstable" and opined that she would be able to discharge parental responsibilities in "about 10, 20 years because she hasn't been successful in treatment offered to her, and she doesn't seem like a good candidate for treatment right now because she doesn't engage well."

¶ 14　　　　Respondent's counsel was unable to call respondent's therapist, Dr. Robert Hamilton, but she argued that Dr. Hamilton would have disagreed with a diagnosis of borderline personality disorder after his seven years of treating respondent. When confronted with this argument, Dr. Kostyshyna explained that she would not be surprised if Dr. Hamilton disagreed with her diagnosis because of the different roles of a subjective clinician versus an objective evaluator. Nevertheless, she indicated that it is possible respondent was just having an off day, that she had not observed her interactions with E.L., and that she had not looked at the medical records of Dr. Timothy Shannon, another member of the psychological team at Chestnut Health Systems who had treated respondent.

¶ 15　　　　Next, Gage L., respondent's brother, testified regarding a domestic violence incident that occurred in April 2024 at the family's residence. He was awakened one morning by "loud talking," and when he entered the hallway, he saw Brice at the top of the stairs and respondent at the bottom of the stairs. He indicated that he "believe[d]" he saw Brice kick

respondent in the head, but he denied seeing him push her down the stairs or out of the residence. Gage L. also denied seeing broken glasses or signs of physical injury to respondent. He denied a history of physical violence or a high frequency of verbal altercations between Brice and respondent.

¶ 16 Natasha Bever, a foster care team supervisor with the Center for Youth and Family Solutions, testified regarding respondent's compliance with the service plan, which included services for substance abuse, domestic violence, therapy, psychiatry, parenting, income, housing, cooperation, and legal issues. While respondent completed most of these items, she was involved in a domestic violence incident in April and another in September, both involving Brice. In her course on domestic violence, she did not make progress in her initial placement with the perpetrator's group. While she made better progress in the victim's group, she did not demonstrate the use of new tools and ultimately returned to a relationship with her abuser. Her therapy notes indicated she had difficulty taking responsibility for her own behavior and how it affects others and she presented as the victim instead of focusing on her own issues, though this improved as time passed. Further, while her housing situation was satisfactory overall, Bever expressed concern about the unstable housing dynamics. Particularly, respondent lived with Brice, Brice's brother, and Brice's mother, who is purportedly emotionally abusive towards respondent.

¶ 17 Regarding other services, while respondent's cooperation was deemed satisfactory, she denied the April domestic violence incident until confronted with the police report documenting it, and she provided minimal information about the September incident. Furthermore, Bever testified that respondent's engagement with therapy was unsatisfactory because, though she attended the sessions, "she had not completed and she hadn't made significant progress." After switching providers because respondent felt judged by her first therapist, Bever saw minimal

discussion of domestic violence in the clinical records. Overall, Bever rated respondent's progress as unsatisfactory.

¶ 18        Skyler Hufeld, a case aid who visited with E.L., testified that respondent and Brice had visitation with E.L. once or twice per week for two to four hours, and they acted appropriately during those visits. E.L. would have "a little moment where he was warming up" but was "pretty happy to see both parents." During visits, they would often put on a movie for background, play with toys, go on walks, and color. He testified that E.L.'s biological parents provided him with food and met his needs. While they occasionally bickered, he opined that it was generally not concerning. Sometimes one parent would be gone for an hour or two during the visit. Respondent left one visit about an hour early to go to the hospital when she did not feel well.

¶ 19        In her testimony, respondent admitted to enduring domestic violence from respondent but minimized its extent. Regarding the domestic violence incident in April, she stated that she was never kicked in the head. Regarding the September incident, she testified that while Brice put his hands around her neck, it was "[n]ot to strangle" her, that she had overreacted, and that the situation could have been handled without police intervention. When asked about a dog cowering in the corner during the incident, as seen on body-worn police camera video, she said she did not remember that detail, but adding that "it might be my brain injury, but no." When questioned about the lessons she learned from her domestic violence course, she stated that she has a safety plan for domestic violence encounters, which her neighbors know. She then shared this word in open court with her abuser in the room. Her testimony further indicated that domestic violence treatment taught her about the cycle of abuse and that "domestic violence is a two-way street." She stated the only way to pass the course was to leave the abuser. When asked whether she had done so, she responded:

"[Brice] makes me financially stable, secure in housing, is the father of my child who he makes very happy, without whom I would not be able to do most of the things that I do. And since everybody is so worried about my seizures, he's the only one that can talk me out of them."

The State pressed for a yes or no answer regarding whether she had left Brice. She ultimately answered in the negative.

¶ 20 Respondent testified that Dr. Hamilton treated her for only depression and anxiety and had ruled out borderline personality disorder. She indicated she had a seizure disorder for the past decade, but that she has an "aura" (her hand goes "tingly" before a seizure starts), which warns her that the seizure is impending, and that this aura "has never failed [her] once."

¶ 21 Respondent further testified that Andrew Stroh, her former caseworker, could have been a better communicator, that she was not informed about visitation switching from twice per month to once per month until very recently, and that the referrals to Chestnut Health Systems occurred only after months of waiting. This testimony conflicted with prior testimony from Bever that Stroh was not a barrier to progress.

¶ 22 Brice declined to offer any testimony or exhibits. The hearing was then adjourned subject to later completion.

¶ 23 When the fitness hearing was reconvened in September, the parties rested without presenting any further evidence and proceeded to make their arguments to the trial court. Before making its determination on fitness, the court noted the evidence during the nine-month period but also specifically said it would consider a few things outside of the applicable nine-month period for the allegations under section 1(D)(m)(ii):

"So the Court would point out that in analyzing this ground, I am considering information only between that nine-month timeframe, or whether one argues that I can state that it reasonably relates to that nine-month timeframe. So, obviously, there are some things that occurred outside February 1 to November 1, such as how we got here, evaluations that were performed that laid the foundation for the services that were necessary. So the Court does consider those things in light of the ground that is alleged in the timeframe that's alleged.

* * *

And I say that because of [respondent's] testimony in this hearing that while not in the nine-month timeframe, she indicates there's still problems in that household with [Brice's] mom and that existed at the outset of this case. We recognize that it's not healthy, but yet we're still there and haven't addressed that issue in the Court's eyes.

* * *

[T]he Court would note that State's Exhibit 18 are the certified records from [Chestnut Health Systems] which have the history of his substance abuse related issues. Again, some of them predate the timeframe, but it's provided to show the Court that there is a significant substance abuse issue that we're dealing with. I can't put that in a vacuum and not consider that.

***

[W]e have a sample early in the morning that shows present – shows the presence of alcohol, and that's been an issue that's been ongoing throughout the life of this case and especially during the nine-month timeframe."

¶ 24        The trial court deemed respondent unfit based on both alleged grounds—the failure to make reasonable progress from February 1 to November 1, 2024, under section 1(D)(m)(ii) and the inability to discharge parental responsibilities under section 1(D)(p). Regarding the former basis, the court indicated she derived minimal benefit and lacked insight into ongoing domestic violence dynamics and that she continued to reside in the same unhealthy household environment. It cited to the body-worn camera footage from the September incident, in which respondent claimed that Brice "threatened to kill her." The court then concluded:

> "[T]he domestic violence issue, which is the primary issue in this case in this Court's eyes, has not been adequately addressed. That, coupled with the illness, even though I don't have to necessarily consider something of that nature when we're talking about progress, it's that lack of understanding, the dynamics in the household that prevent a return home of [E.L.] to [respondent's] care.
>
> I don't think she's made reasonable progress toward the return home because of those issues."

¶ 25                              D. Best-Interest Hearing

¶ 26        Upon conclusion of the second part of the fitness hearing, the trial court proceeded directly to the hearing on the best interest of the child, during which it determined that it was in E.L.'s best interest for respondent's parental rights to be terminated. It then entered an order of termination.

¶ 27        This appeal followed.

¶ 28                              II. ANALYSIS

¶ 29        On appeal, respondent argues that the trial court erred in finding that the State proved her unfit by clear and convincing evidence. Specifically, respondent challenges two

separate and independent grounds for the finding of unfitness: lack of reasonable progress during the February 1, 2024, to November 1, 2024, nine-month period under section 1(D)(m)(ii) and inability to discharge parental responsibilities under section 1(D)(p).

¶ 30    A determination of parental unfitness involves factual findings and credibility determinations that the trial court is in the best position to make because its " 'opportunity to view and evaluate the parties *** is superior to that of a reviewing court.' " *In re M.I.*, 2016 IL 120232, ¶ 21 (quoting *In re Brown*, 86 Ill. 2d 147, 152 (1981)). A trial court's finding of parental unfitness will not be reversed unless it is against the manifest weight of the evidence. *In re N.G.*, 2018 IL 121939, ¶ 29. A decision is against the manifest weight of the evidence only when "the opposite conclusion is clearly evident or where the finding is unreasonable, arbitrary, or not based on the evidence." *In re Shauntae P.*, 2012 IL App (1st) 112280, ¶ 89. The trial court's judgment can be affirmed on any one of the independent grounds supporting the finding of unfitness. See *In re D.F.*, 201 Ill. 2d 476, 505 (2002).

¶ 31    Here, we find that the finding of unfitness can be affirmed on the failure "to make reasonable progress toward the return of the child to the parent" during the relevant nine-month period under section 1(D)(m)(ii). Particularly, the record shows that respondent has not meaningfully dealt with the domestic violence issues in her life. Respondent believes it takes two people for domestic violence to occur, and she was told she could not pass the domestic violence training if she returned to her abuser, yet she willingly did so. She is entangled with Brice, relying upon him for housing, financial stability, and support for her seizures that she feels only he can provide. She testified that, "without [him] I would not be able to do most of the things that I do." It is not clear she would be in a position to leave her abuser and adequately support E.L. if domestic violence were to continue.

¶ 32　　　　She initially denied the April domestic violence incident in which she was purportedly pushed down the stairs and kicked in the head, admitting it only when shown the police report and minimized it thereafter. When confronted with the September domestic violence incident from near the end of the nine-month period, she indicated that she had overreacted, though she acknowledged that Brice put his hands around her neck. The trial court also noted evidence that Brice threatened to kill her. The fact that a dog was noted to have been cowering in fear during the incident gives some indication of the environment at the time. The record indicates that domestic violence was not amply discussed in therapy. These circumstances corroborate the court's observation that respondent has not taken full accountability for the serious domestic violence recurrences and has continued to diminish them.

¶ 33　　　　Furthermore, respondent referred to one of the stages in the cycle of abuse as the "jackass stage," which the trial court viewed as her failure to fully grasp the concepts taught in the course. She stated her safety word in open court for her abuser to hear, which the court viewed as her failure to understand the function and importance of that word. Regardless of whether domestic violence was the basis of E.L.'s removal from respondent's custody in the first place, and regardless of whether the domestic violence service was completed, the record shows that respondent engaged on, at best, a superficial level with the domestic violence course. The court's concern regarding domestic violence at the conclusion of the nine-month period was amply supported by the evidence, as is its finding of unfitness. See *In re A.M.*, 2025 IL App (1st) 250467, ¶ 43 (affirming finding of unfitness as to the respondent mother due to choosing to remain in relationship with the abusive father); *In re Janine M.A.*, 342 Ill. App. 3d 1041, 1051-52 (2003) (finding unfitness when mere completion of the service plan items failed to actually help the respondent become a better parent); see also *In re Ta. T.*, 2021 IL App (4th) 200658, ¶¶ 56-57

(affirming finding of unfitness, despite the parent completing every task in the service plan and communicating with the caseworker, where the children could not be returned home safely); *In re T.D.*, 268 Ill. App. 3d 239, 247-49 (1994) (affirming finding of unfitness regardless of technical compliance with the service plan).

¶ 34                                   III. CONCLUSION

¶ 35          For the reasons stated, we affirm the trial court's judgment.

¶ 36          Affirmed.